[No. S016081. Aug. 12, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
MAUREEN McDERMOTT, Defendant and Appellant.

948

**COUNSEL**

Steffan Imhoff and Verna Wefald, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Mary Sanchez, Lori R. Mars, Susan Lee Frierson, John R. Gorey and G. Tracey Letteau, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted defendant Maureen McDermott of one count of murder (Pen. Code, § 187, subd. (a))[1] and one count of attempted murder (§§ 664, 187, subd. (a)). The jury found true special circumstance allegations that the murder was carried out for financial gain (§ 190.2, subd. (a)(1)) and by means of lying in wait (§ 190.2, subd. (a)(15)). Defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239.)

## I. FACTS AND PROCEEDINGS

### A. Guilt Phase

On April 28, 1985, Stephen Eldridge was brutally stabbed to death in the home he shared with defendant, Maureen McDermott. It was undisputed at trial that the actual killers were Jimmy Luna (a former coworker and personal friend of defendant's) and two brothers whom Luna had hired for the murder, Marvin and Dondell Lee. The prosecution's theory at defendant's trial was that defendant had hired Luna to kill Eldridge so she could obtain sole ownership of a house she co-owned with Eldridge and collect $100,000 under an insurance policy she had on Eldridge's life. Luna (who had pled guilty to first degree murder) and both Marvin and Dondell Lee (who had received complete immunity and were never charged with the murder) testified against defendant. Defendant denied complicity in Eldridge's murder.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

### 1. *Prosecution evidence*

At the time of Stephen Eldridge's murder in 1985, defendant was 37 years old. During the day, she worked as a registered nurse at a hospital (Los Angeles County-USC Medical Center), and in the evening she provided nursing care to Lee La Porte at his home. Defendant shared a house in Van Nuys with Eldridge, a 27-year-old, self-employed landscaper. They owned the property as joint tenants. In December 1984, defendant and Eldridge had each bought $100,000 in life insurance, designating each other as beneficiary.

In early 1985, defendant's relationship with Eldridge deteriorated. Eldridge complained about the unkempt condition of the house and about defendant's pets. Defendant was upset about Eldridge's treatment of her pets and his plans to sell his interest in the house. Near the end of February 1985, defendant discussed with Jimmy Luna, a hospital coworker and personal friend, a plan to kill Eldridge. Defendant told Luna that she had an insurance policy on Eldridge's life and that she wanted him dead. She offered Luna $50,000 to kill Eldridge, and he agreed. Defendant told Luna that she wanted Eldridge stabbed because a gun would make too much noise, and that she wanted the killing to look like a "homosexual murder" because she thought the police would not investigate the murder of a homosexual as vigorously as other killings. To make the murder look like a homosexual killing, defendant on different occasions suggested that Luna carve out the word "gay" on the body with a knife or cut off the victim's penis.

On three occasions in late February and early March of 1985, defendant arranged for Luna to be at the house she shared with Eldridge so Luna could kill Eldridge. Each time, however, Luna became frightened and could not carry out the murder. Defendant then suggested to Luna that he find someone to help him kill Eldridge, but she told him she did not want anyone but Luna to know of her involvement.

In March 1985, Luna asked his friend Marvin Lee to help him commit the murder. He told Marvin that an "organization" wanted someone killed, and he offered Marvin $3,000 to "watch [his] back." Marvin agreed. In later conversations, Luna told Marvin that the intended victim was a homosexual and that Luna would castrate the victim to make it look like a "homosexual murder."

In the evening of March 21, 1985, Luna and Marvin knocked on the door of the house where defendant and Eldridge lived. As Eldridge opened the door, Luna and Marvin forced their way inside. Threatening Eldridge with a

knife, Luna ordered him to crawl on his hands and knees into the bedroom and to lie facedown on the bed. Luna then cut Eldridge on the buttocks with the knife and yelled homosexual epithets at him. From another room, Marvin retrieved a two-foot-long bedpost, with which Luna struck Eldridge on the head. Eldridge jumped up and ran out of the house. Luna and Marvin left.

Los Angeles Police Officer David Yates, who was dispatched to investigate the attack on Eldridge, found him at the house dressed only in his underwear and covered in blood. An ambulance took Eldridge to a hospital for treatment.

The next day, defendant spoke on the telephone with Luna about the failed murder attempt, telling him, "we are going to have to do it again, and this time you can't fail." After March 21 but before April 28, 1985, there were several telephone conversations between defendant and Luna. During one of these conversations, Marvin was with Luna, and he listened in as defendant discussed the murder plan and what they would do with the anticipated insurance proceeds. Defendant objected to Marvin's participation in the planned murder; she said that if Marvin told anyone about it, Luna would "have to kill that nigger too." Luna assured her that Marvin was trustworthy and would not say anything. Marvin's brother Dondell overheard part of this conversation when Marvin passed him the telephone.

On the day of the murder, April 28, 1985, Luna met Marvin and Dondell Lee, and Luna offered Dondell money to help commit the murder. Luna then made several telephone calls to defendant, during which defendant told Luna that she would leave a front bedroom window open for entry into the house and that Luna should tie her up and cut or hit her so she would look like a robbery victim.

Around 8:15 p.m., Luna, Marvin, and Dondell entered the house through the front bedroom window. Luna went down the hall to defendant's bedroom, where defendant told him that Eldridge had not yet returned from a dinner engagement. Defendant told Luna to cut her on the breast and inner thigh, which he did, to make it appear that Eldridge was killed when he came home while defendant was being robbed.

Around 10:40 p.m., Eldridge came home. When he entered the house, Dondell Lee met him with a rifle owned by defendant, but provided to him by Luna. Marvin Lee then grabbed Eldridge by the neck in a chokehold and took him down the hall, where Luna repeatedly stabbed him until he slumped to the floor. Luna then returned to defendant's bedroom, where he found defendant lying on the floor with a facial injury. Defendant asked

Luna how the injury looked, saying she had banged her head on a table in the bedroom. As Luna and the two Lee brothers were about to leave the house, Marvin Lee overheard defendant yell from the back bedroom not to forget to cut off Eldridge's penis. Luna did so.

Los Angeles County Deputy Medical Examiner Susan Selser performed the autopsy. She testified that Eldridge had been stabbed 44 times and that his penis was cut off postmortem. Of the 44 stab wounds, 28 were independently fatal.

On May 23, 1985, Luna was taken into custody for questioning, but he was released within 72 hours. On July 2, 1985, he was arrested for the first degree murder of Eldridge. In August 1985, defendant was also arrested. She was charged with attempted murder, and murder and special circumstance allegations of murder for financial gain and lying in wait. Marvin Lee, who was in custody for an unrelated offense, was granted immunity for the murder of Eldridge in exchange for his confession and truthful testimony. In August 1986, Dondell Lee was granted immunity while in the custody of the California Youth Authority. In July 1989, Luna entered into a plea agreement under which he pled guilty to first degree murder and agreed to testify truthfully in the prosecution of defendant.

### 2. *Defense evidence*

The main theory of the defense at trial was that the prosecution had not proven its case against defendant. Defense counsel cross-examined prosecution witness Luna for eight days, thoroughly challenging his veracity. The defense also presented the testimony of five of Luna's former coworkers from Los Angeles County-USC Medical Center that Luna was a habitual liar.

Defense witness Dr. John Ryan, a pathologist, testified that—based on his review of the autopsy report—Eldridge's stab wounds had been inflicted by two different weapons.

### B. *Penalty Phase*

### 1. *Prosecution evidence*

At the penalty phase, the prosecution presented evidence that defendant had Luna beat up someone so she could obtain that person's job.

In April 1983, Dewayne Bell, John Phillips, and Philip La Chance worked alternating shifts at the La Porte residence as caretakers for the elderly Lee

La Porte. At that time, Bell had worked for the La Portes for five years. While La Chance was in jail for driving under the influence, defendant temporarily assumed his caretaker duties. Defendant told Luna that she wanted permanent employment with the La Portes, and she offered Luna money to injure Bell so she could take his job. Luna later attacked Bell at his home, slashing Bell's face, throat, and chest. When Bell returned to his caretaker duties at the La Portes' home, defendant had Luna repeatedly telephone the La Portes and make threats against Bell when Betty La Porte answered the phone. As a result of these calls, Bell lost his job with the La Portes, and defendant took over Bell's duties.

### 2. Defense evidence

At the penalty phase, the defense presented testimony of defendant's coworkers, her brother, prison guards, and a criminal justice expert.

Dr. Philip Merritt, who had worked with defendant at the county hospital, described defendant as a compassionate and caring nurse.

According to Carol Kelly, a nurse and defendant's colleague at the hospital, defendant was a hard worker who was dependable and well liked by the patients and student nurses.

Wayne McDermott, defendant's brother, testified that defendant was very loving towards their mother, to whom she regularly sent money. He expressed the hope that defendant not be given the death penalty.

Margaret Stokes, a deputy sheriff who worked at the Sybil Brand Institute for Women in Los Angeles, described defendant as a cooperative, sensitive, and caring person who had saved an inmate from choking. In her view, defendant had adjusted well to incarceration. Another deputy, Victoria Samaniego, mentioned that because of defendant's reliability she had been made a jail trusty, and that she had never caused problems.

Jerry Enomoto, a college professor, criminal justice consultant, and former Director of the Department of Corrections, stated his opinion that defendant would adjust well in prison if sentenced to life without the possibility of parole.

## II. JURY SELECTION ISSUES

### A. Prosecutor's Exercise of Peremptory Challenges

Defendant contends she was denied both her state constitutional right to trial by a jury drawn from a representative cross-section of the

community (Cal. Const., art. I, § 16) and her federal constitutional right to equal protection (U.S. Const., 14th Amend.) because the prosecution impermissibly used its peremptory challenges to remove prospective jurors on the basis of race (see *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 [106 S.Ct. 1712, 1716-1719, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748]). We disagree.

## 1. *Facts*

During the initial jury selection process, the defense excused 20, and the prosecution 18, prospective jurors on peremptory challenges. The prosecution exercised six of its 18 peremptory challenges against Black prospective jurors, while the defense removed one Black prospective juror by peremptory challenge. The jury that was sworn included no Blacks.

Immediately after the jury was sworn, the trial court recalled that one of the jurors had told the bailiff he had read a newspaper article about the case. After inquiring into the matter, the trial court discharged this juror. To select a replacement for the discharged juror, the court granted the defense one peremptory challenge and the prosecution two peremptory challenges.

The first prospective juror called, James T., was Black. After both sides passed for cause, the prosecutor exercised a peremptory challenge against him. The next prospective juror called, Gerald W., was also Black. When the defense did not challenge him for cause, the prosecution immediately exercised its remaining peremptory challenge against Gerald W. At that point, the defense accused the prosecution of exercising its peremptory challenges for the constitutionally impermissible purpose of eliminating prospective jurors because of their race.

The trial court asked the prosecutor to give her reason for excluding Prospective Juror Gerald W., but the court stated it was not making a finding that the defense had established a prima facie case of racial motivation. The prosecutor replied that Gerald W. had initially "said that he favored the death penalty only in situations if a person had a criminal record," although the prosecutor acknowledged that Gerald W. had "changed his mind later." The prosecutor also asserted that on his questionnaire Gerald W. had said he was in favor "basically of rehabilitation and counseling before punishment such as the death penalty."

Defense counsel observed that the prosecutor had exercised eight of 20 peremptory challenges against Black prospective jurors and that the jury as constituted did not include any Blacks. Asserting that the prosecutor had

used peremptory challenges to excuse Blacks who "were fundamentally pro prosecution on the death penalty issue," defense counsel argued that exclusion based on race was the only explanation for the prosecutor's use of peremptory challenges against Blacks.

The trial court commented that although the jury as sworn included no Blacks, the prosecutor had earlier *twice* accepted a jury that included a Black juror whom the defense later peremptorily challenged. The court then asked to see defense counsel's copies of the questionnaires of the Black prospective jurors whom the prosecutor had excused by peremptory challenge, noting that counsel's copies were more organized than the court's. As defense counsel handed the questionnaires to the court, the prosecutor made comments as to some of the excused Black prospective jurors. Noting that Keia M. was only 19 years old, the prosecutor said she "didn't feel she [Keia] was mature enough" to sit as a juror in this death penalty case because "her views were not thought out at all." As to Theola J., the prosecutor described her as "very, very stupid," adding that "she couldn't see herself ever giving the death penalty." Of Gilbert K. the prosecutor noted that he "stated that he would consider the death penalty if the crime was particularly brutal" but "he doesn't want the death penalty unless the defendant would kill again in prison," and the prosecutor "didn't feel that was a realistic prospect for the defendant in this case."

The trial court said it might "be prepared to find a prima facie case" and would have to "go through each explanation to see if there is any reasonable basis for the exercise of the challenge." After a recess, the court stated: "I think I have all the information I need." The court found that the defense had established a prima facie case, and said it was "looking at all the questionnaires of Black jurors who have been excused and listening to [the prosecutor's] explanations and trying to see if there is a reasonable relationship between the reason for the excusal and the viewpoints of the jurors."

Asked by the trial court if she wanted to be heard any further, the prosecutor replied: "I would like to say one more thing that in addition to the explanations which I have provided to the court with respect to each one of these jurors which honestly wouldn't have made any difference to me what their race was, given some of their views, I also took into account the fact that I believe that all these jurors weren't necessarily opposed to the death penalty, but that I had a pool of jurors out in the audience who I thought were more in favor of the death penalty than these particular jurors. And that it was no reason to keep them. [¶] I didn't feel they would be good prosecution jurors on the issue of the death penalty. [¶] And I would have preferred, frankly, to have a number of Black jurors on this case because of

the fact that the defendant makes racist remarks which will be coming into evidence. And that I have two Black prosecution witnesses Marvin Lee and Dondell Lee. And that I would have liked to have some Black jurors."

The trial court remarked that at issue were the "death penalty views" of the prospective jurors, and it found a "reasonable relationship" between those views expressed either in the juror questionnaires "or orally by the prospective juror" and the prosecutor's challenge to each of those jurors. The court noted that in making this finding it had also taken into account that the prosecutor had *twice* earlier accepted the jury when it included one Black juror. The court denied the defense motion.

The jury selection process continued, and a 12th juror, Harold O., was selected and sworn. Thereafter, six alternate jurors were selected and sworn. One of the alternates was Margaret C., a Black woman, who eventually served on the jury, replacing a juror excused during the trial.

### 2. *Analysis*

██ "The exercise of peremptory challenges to eliminate prospective jurors because of their race violates the federal Constitution (*Batson* v. *Kentucky*[, *supra,*] 476 U.S. 79, 89 [106 S.Ct. 1712, 1719]) and the California Constitution (*People* v. *Wheeler*[, *supra,*] 22 Cal.3d 258, 276-277 . . .)." (*People v. Williams* (1997) 16 Cal.4th 635, 663 [66 Cal.Rptr.2d 573, 941 P.2d 752].) A party claiming an opponent improperly discriminated in the exercise of peremptory challenges must make a timely objection and demonstrate a strong likelihood that prospective jurors were excluded because of their race or other group association. (*Id.* at pp. 663-664; *People v. Arias* (1996) 13 Cal.4th 92, 134-135 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

This court has stated that a motion alleging discriminatory use of peremptory challenges is untimely if "first asserted after the jury has been sworn." (*People v. Thompson* (1990) 50 Cal.3d 134, 179 [266 Cal.Rptr. 309, 785 P.2d 857].) We made that statement, however, in the context of a motion brought after all jury impanelment procedures had been concluded. (*Id.* at pp. 178-179; see also *People v. Perez* (1996) 48 Cal.App.4th 1310, 1314 [56 Cal.Rptr.2d 299].) As other courts have recognized, discriminatory motive may become sufficiently apparent to establish a prima facie case only during the selection of alternate jurors, and a motion promptly made before the alternates are sworn, and before any remaining unselected prospective jurors are dismissed, is timely not only as to the prospective jurors challenged during the selection of the alternate jurors but also as to those dismissed during selection of the 12 jurors already sworn. (*People v. Rodriguez* (1996)

50 Cal.App.4th 1013, 1023 [58 Cal.Rptr.2d 108]; *People v. Gore* (1993) 18 Cal.App.4th 692, 701-706 [22 Cal.Rptr.2d 435]; see also *Morning v. Zapata Protein (USA), Inc.* (4th Cir. 1997) 128 F.3d 213, 215 [stating that a *Batson* challenge must "be raised, at the latest, before the venire is excused"]; *Dias v. Sky Chefs, Inc.* (9th Cir. 1991) 948 F.2d 532, 534 [stating that *Batson* challenge must "occur as soon as possible, preferably before the jury is sworn"].) Thus, it is more accurate to say that the motion is timely if made before jury impanelment is completed because "the impanelment of the jury is not deemed complete until the alternates are selected and sworn." (*In re Mendes* (1979) 23 Cal.3d 847, 853 [153 Cal.Rptr. 831, 592 P.2d 318].) Here, the defense motion was timely because it was made before the alternate jurors were selected and sworn.

The party, here defendant, who claims the opposing party has engaged in discriminatory use of peremptory challenges bears the initial burden to establish a prima facie case—that is, to raise a reasonable inference that the opposing party has challenged the jurors because of their race or other group association. (*People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Here, the trial court found that the defense had established a prima facie case, and we assume that finding is supported by substantial evidence. (*People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

Once the trial court finds that the moving party has made a prima facie case, the burden shifts to the opposing party to provide an explanation for the peremptory challenges that is race or group neutral and related to the particular case being tried. (*People v. Silva, supra,* 25 Cal.4th at p. 384; *People v. Ervin* (2000) 22 Cal.4th 48, 74-75 [91 Cal.Rptr.2d 623, 990 P.2d 506].)

Here, the prosecutor said she had peremptorily challenged the eight Black prospective jurors because their views on the death penalty were unfavorable to the prosecution. Although the prosecutor also stated that one juror, Keia M., was immature, and that another, Theola J., was "very stupid," the trial court understood that the overriding reason for challenging the eight prospective jurors was the attitude of each toward the death penalty. The Attorney General agrees that the prosecutor challenged each of the eight Black prospective jurors for essentially the same reason, namely, that "the prospective juror's views and attitudes regarding the death penalty were adverse to the prosecution . . . ."

■ A prospective juror's views about the death penalty are a permissible race- and group-neutral basis for exercising a peremptory challenge in a

capital case. (*People v. Mayfield* (1997) 14 Cal.4th 668, 724 [60 Cal.Rptr.2d 1, 928 P.2d 485].) ▮▮▮▮ When the trial court has found a prima facie case, and the party exercising the peremptory challenges has stated a race-neutral reason for each challenge, "the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834]; see also *People v. Silva, supra,* 25 Cal.4th at p. 384.) The trial court's ruling on this issue is reviewed for substantial evidence. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196 [58 Cal.Rptr.2d 385, 926 P.2d 365].) But we apply this deferential standard of review only when "the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror." (*People v. Silva, supra,* 25 Cal.4th at p. 386; accord, *People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75]; *People v. Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854].)

▮▮▮▮ We consider each of the eight challenged jurors, taking them in the order in which the prosecutor challenged them.

### a. *Patricia M.*

On the jury questionnaire, in response to a question about her general feelings on the death penalty, Patricia M. wrote: "If evidence is presented of one taking a life without justifiable cause—for example, molesting children or child abuse—I really have no problem with a guilty verdict—or where proof is shown where someone took anyone [*sic*] life just for thrills." She wrote that she had voted to reinstate the death penalty when it was on the ballot in 1978, and she stated that "the State should have the right to execute, depending on the circumstance, an individual who—unlawfully kills another human being, whether intentionally or not."

On voir dire, defense counsel asked what Patricia M.'s views would be on the appropriate penalty if she were to find defendant guilty of first degree murder with the special circumstance of lying in wait or financial gain. She answered: "I would probably be more apt to say life without the possibility of parole." Asked to explain, she said: "Because to me it is death anyway. You're going to be confined and it said without any parole. You're going to die there anyway. It is a slow death."

Under questioning by the prosecutor, Patricia M. said that death was a more severe punishment than life imprisonment without parole. Asked whether she would be more inclined to vote for life imprisonment without parole if the victim was not a child, she replied: "Depending on the situation with her as to why—if in fact she killed the person. It would be the

involvement. I'd have to hear the circumstances surrounding it. But I don't feel that I would be swayed one way or the other as to more for the death or more for imprisonment."

Asked whether a premeditated murder for financial gain was "the type of murder [she] would consider the death penalty for," she replied, "Possibly." Asked whether she felt the death penalty "really serves any purpose," she replied, "Not really."

Having reviewed the record—especially Patricia M.'s view that the death penalty did not serve any purpose and her stated inclination to impose life imprisonment rather than death for a premeditated murder carried out for financial gain—we conclude that substantial evidence supports the trial court's findings that the prosecutor could reasonably view Patricia M. as unfavorable on the penalty issue and that the prosecutor's peremptory challenge against her was based on her death penalty views and not on her race.

b. *Gilbert K.*

On the jury questionnaire, in response to a question about his general feelings on the death penalty, Gilbert K. wrote: "Necessary in some cases to protect the population, and society." Gilbert K. thought the state had the right to impose capital punishment for both intentional and unintentional killings.

On voir dire, in response to a question whether he had strong feelings about the death penalty either way, Gilbert K. replied: "No, I wouldn't, especially I would say that I feel every case has its own merits, and depending on what the case is about and what is happening, I would decide from that point." The prosecutor asked Gilbert K. to rate his death penalty views on a scale of one to 10, "10 being somebody who would always impose it in a case of premeditated murder, an eye for an eye; you kill somebody, you get the death penalty; one let's say being somebody who would never do so." Gilbert K. answered that he "would probably be somewhere around a four or five, depending on the case itself and a person is found guilty and circumstances involved in it." The prosecutor asked whether this meant Gilbert K. was "somebody who kind of leans away from the death penalty." Gilbert K. replied, "I find myself straddling the line basically at five until I hear the difference to persuade me either way or the other."

The prosecutor asked whether Gilbert K. could "think about any type of case just in the abstract that . . . in your mind would call for the death

penalty." He replied: "Possibly a case where a person who could be found guilty or would be found guilty I would say was a person that could possibly want to commit murder again. [¶] That would make me think more about the death penalty. [¶] A person that could possibly go back out and kill somebody else again or couldn't be controlled to keep somebody from hurting again." The prosecutor reminded Gilbert K. that the alternative penalty was life imprisonment without parole, meaning that "the person would never come out of prison alive." Gilbert K. replied: "But that person would be in prison with other people, and people are, even though they may be in prison, can be hurt in prison."

The prosecutor then asked Gilbert K. if he could see himself ever voting for the death penalty if he "did not feel that there was a chance that the person would kill again." Gilbert K. replied: "If I did not feel the person would kill again, that's very doubtful. It is very doubtful." Asked to explain further, he added: "Because of the fact that the person is to me is under total control or being controlled for the rest of their life. [¶] I don't see the necessity to kill somebody for that. . . . What I am just basically saying is depending on the circumstances and the circumstances of the case itself, if a person was found guilty of the crime, and I felt that they could not do anybody any other harm or that they were the type of person warranted any other harm, life in prison I think would fit. [¶] If a person was a person who I felt was dangerous to society or to themselves, or a type of person who without any thought or malice could hurt somebody at any time, I say that is the person who maybe would be a good candidate for the death penalty."

Under further questioning by the prosecutor, Gilbert K. modified his views. He said he could see himself voting to impose the death penalty on a defendant who would not likely kill again if the defendant was guilty of a premeditated murder by lying in wait or for financial gain and the crime was particularly brutal or cold-blooded or had been planned over a long period of time.

Having reviewed the record, we conclude that substantial evidence supports the trial court's finding that the prosecutor could reasonably view Gilbert K. as unfavorable on the penalty issue. Because defendant apparently had no history of violence and did not personally commit the capital murder, the prosecutor had little basis to argue that defendant would kill again if sentenced to prison for life without parole. Although Gilbert K. eventually said he could see himself voting to impose the death penalty on a defendant who was not likely to commit future violent acts, his earlier responses, questioning the need to execute someone who posed little or no threat of violence in prison, could be a matter of legitimate concern to the prosecutor

in this case. We see no basis to disturb the trial court's finding that the prosecutor's peremptory challenge against Gilbert K. was based on his death penalty views and not on his race.

### c. *Theola J.*

On the jury questionnaire, in response to a question about her general feelings on the death penalty, Theola J. wrote: "Mixed." Asked during voir dire to explain what she had meant, she said: "Well, I feel that I don't think—just like if I have a chance to decide on that, I don't think I would." Asked whether she meant she would have difficulty voting for the death penalty, she said: "No, I wouldn't have—after I see, you know, what everything that I listened to, you know." She said she would not automatically vote either for or against the death penalty, but instead would listen to any evidence presented on the issue of penalty. She said: "I would have to hear. I would have to make up my mind after I hear what's presented before me. I just couldn't say right now, you know. I couldn't say one way or the other because like I said, mixed. I don't know really, you know."

Asked by defense counsel whether she would be "somewhere in the middle" on a scale of one to 10, Theola J. answered in the affirmative. Asked by the prosecutor whether she thought the State of California should have the right to execute somebody for a particular kind of murder, Theola J. said: "Well, I think they should have that right. I say under certain circumstances, I think." Asked to explain what circumstances would warrant the death penalty, she said: "It would really have to be horrible. . . . Some of the things that I might, you know, that a person what I believe just didn't have a heart, you know, that would do something to somebody. That's the way I feel."

The prosecutor asked Theola J. whether she felt "that the state should have the right to execute somebody if they are found guilty of a first degree premeditated deliberate murder." Theola J. replied: "No, I don't think so." Asked to explain, she said: "Well, I would think that it could be another punishment, you know, maybe life or something." On further probing of her views by the prosecutor, Theola J. said: "Well, like I said, maybe the state should have the right under certain circumstances, but some of them that I don't think that I would think it was that—that they should have that right." Asked to explain what circumstances would warrant the death penalty, she said: "Like I said before, it would have to be worse than death. . . . It would have to be, like I said, a more—even though that's violent, it would have to be a little more violent or something, I think."

At this point the trial court intervened and explained to Theola J. that under this state's laws not every first degree murder qualifies for the death

penalty, that a first degree murder with the special circumstances of financial gain or lying in wait did qualify for the death penalty, and that the jury would determine penalty only if it found defendant guilty beyond a reasonable doubt of first degree murder with one or both of these special circumstances. Theola J. indicated that she understood the court's explanation, that it seemed different than what the prosecutor had asked her, and that she did not have any problem with the law as the court had explained it. The court asked Theola J. whether she was "one of those persons who would never vote for the death penalty under those circumstance, under those conditions." She answered: "No, I don't think I would be one that would never vote for it. I think I would vote for it. But, like I said, I would have to hear. They would have to convince me. See, I would have to be convinced, you know, because I could say, well, I would decide, you know, I wouldn't want this to happen or want this to happen, but my mind could change after hearing what I have to hear. That's the only way I could be convinced."

The prosecutor then asked whether Theola J. felt "that the state should have the right to execute somebody who has committed a premeditated, deliberate murder by lying in wait." Theola J. replied: "Yes, I think so." Asked whether such a crime would be "horrible enough" to make the death penalty appropriate, Theola J. said: "Yeah, I think so after I hear. Like I said, it is really hard for me because I could say one thing and then after I hear it I could say maybe I shouldn't have said that. After I hear. After you hear things and it's been explained to you from A to Z, it is a lot better than just trying to say it now. You know, I think the more I would hear about what happened then my decision could be, you know, I could decide for myself, you know, which way I would really feel."

Having reviewed the record, we conclude that substantial evidence supports the trial court's finding that the prosecutor could reasonably view Theola J. as unfavorable on the penalty issue. Although her responses were confused and inconsistent, and her final statements indicated neutrality on the death penalty, two of her answers could cause the prosecutor legitimate concern. Most obviously, she said she did not think the state should have the right to impose the death penalty for a first degree premeditated deliberate murder, and she thought there could be another punishment, such as life imprisonment. Although she modified or explained this view, she then said that to impose the death penalty "they"—by inference the prosecution— would have to convince her, suggesting that she might enter the penalty phase with something like a presumption in favor of the alternate penalty of life without parole. In view of these responses, we see no basis to disturb the trial court's finding that the prosecutor's peremptory challenge against Theola J. was based on her death penalty views and not on her race.

#### d. *Brenda B.*

On the jury questionnaire, in response to a question about her general feelings on the death penalty, Brenda B. wrote: "In some cases I believe in the death penalty. However, only when there can be no rehabilitation at all." She repeated this view on voir dire, stating: "I believe that a person—if a person can be rehabilitated and if they're truly sorry for what they did . . . . I believe in giving them a chance to prove it." At one point she said she would automatically vote for life without parole, rather than death, if she was convinced the defendant could be rehabilitated. Although she later retreated from this position somewhat, she continued to view the potential for rehabilitation as the most important consideration in determining penalty in a capital case. Because defendant had no prior criminal record, the prosecutor might reasonably conclude that Brenda B.'s focus on rehabilitation made her an unfavorable jury for the prosecution on the penalty issue. Substantial evidence supports the trial court's finding that Brenda B.'s views on the death penalty, rather than her race, were the basis for the prosecution's peremptory challenge.

#### e. *Kathryn S.*

On the jury questionnaire, in response to a question about her general feelings on the death penalty, Kathryn S. wrote: "I really don't know for sure. I have never really given it thought." On voir dire, the trial court asked if she had since given thought to the death penalty. Kathryn S. said she had, adding: "I don't have any feelings one way or the other." Asked whether she believed there should be a law allowing for the death penalty, she said: "I don't know. I really can't say if there should be a law or there shouldn't."

On voir dire by defense counsel, Kathryn S. said she would want to hear from defendant in making the penalty determination, but that she would not necessarily vote for death if defendant did not testify. She said that on a scale of zero to 10, with zero being never voting to impose the death penalty and 10 being always voting to impose the death penalty, she would consider herself a five.

The prosecutor asked Kathryn S. whether she thought the death penalty was "worse" than life without possibility of parole. At first, Kathryn S. replied: "I really can't say. I don't know. They are both bad." The prosecutor asked which of these punishments Kathryn S. would impose if she "wanted to punish somebody the worst that you possibly could." Kathryn S. said: "Maybe I would say life in prison. . . . So they could have a chance to think about what they did." Asked again which punishment she would

choose to punish someone "in the most harsh manner that you could," Kathryn S. said: "Life without possibility of parole." Asked why she would ever "give the death penalty," Kathryn S. replied: "I don't know that I would. I mean I can't say. Why would I—I don't know why I would ever give it or if I would."

After reviewing the record, we conclude that substantial evidence supports the trial court's finding that the prosecutor could reasonably view Kathryn S. as unfavorable on the penalty issue. Although her responses generally indicated neutrality on the death penalty, she expressed considerable doubt that the death penalty was a harsher punishment than life in prison without possibility of parole and she could not explain why she would ever choose the death penalty over life without parole. In view of these responses, we see no basis to disturb the trial court's finding that the prosecutor's peremptory challenge against Kathryn S. was based on her death penalty views and not on her race.

### f. *Keia M.*

On the jury questionnaire, in response to a question about her general feelings on the death penalty, Keia M. wrote: "It depends on the case." On voir dire by the trial court, Keia M. said she did not have strong feelings either way about the death penalty and would not automatically vote either for or against it.

On voir dire by defense counsel, Keia M. agreed that she was "right down the middle" on the death penalty and that on a scale of zero to 10 her views on the death penalty would be a five.

The prosecutor on voir dire asked Keia M. if she had any thoughts on whether life in prison without possibility of parole or death was "worse as a punishment." Keia M. replied: "I really don't think one is worse than the other. I can't say that life imprisonment, in prison is worse than the death penalty, because I have never been in prison. I mean, I don't know the situation. But I would think that there is no difference. There is really not a difference." Asked which penalty she would choose if she "wanted to punish the person the most severely that [she] could," Keia M. replied: "The death penalty." She explained: "You just go faster. You don't—well, not a lot of people think the way I do. I think the more time you have here on this earth, the better it is, you know, no matter where you are."

Substantial evidence supports the trial court's finding that the prosecutor could reasonably view Keia M. as unfavorable on the penalty issue. Although her responses generally indicated neutrality on the death penalty, and

although she eventually expressed the view that the death penalty was a harsher punishment than life in prison without possibility of parole, she nonetheless had expressed the view that there was really no difference between the two penalties in terms of severity. Given this expression of opinion on an issue critical to penalty determination, we see no basis to disturb the trial court's finding that the prosecutor's peremptory challenge against Keia M. was based on her death penalty views and not on her race.

### g. *James T.*

On the jury questionnaire, in response to a question about his general feelings on the death penalty, James T. wrote: "I have mixed feeling because my religious beliefs condem [*sic*] killing, yet I feel punishment should fit the crime." On voir dire by the trial court, James T. said there was no conflict between his religious beliefs and state law allowing a jury to impose the death penalty and that he would not automatically vote either for or against it.

On voir dire by the prosecutor, James T. said that the biblical command "Thou shalt not kill" applied to "everybody in society" but not to the state. He affirmed again that voting as a juror to impose the death penalty would not conflict with his religious views. He said that a murder deliberately planned for financial gain was the type of murder that could get his vote for the death penalty. Asked whether he thought our society should have a death penalty, James T. replied: "I think that society needs to be in a situation where they should not have a death penalty. And that's what I am just saying. No one should kill another person, you know, to bring the situation up." The prosecutor then asked whether James T. would vote for the death penalty if it was on the ballot. James T. answered: "I would probably vote no. . . . Because simply killing is wrong."

Substantial evidence supports the trial court's finding that the prosecutor could reasonably view James T. as unfavorable on the penalty issue. Although he consistently denied any conflict between his religious views and state law on the death penalty, James T. said he would vote against it if it appeared on the ballot because of his strongly held view that killing is wrong. Given this expression of doubt about the moral legitimacy of the death penalty, we see no basis to disturb the trial court's finding that the prosecutor's peremptory challenge against James T. was based on his death penalty views and not on his race.

### h. *Gerald W.*

On the jury questionnaire, in response to a question about his general feelings on the death penalty, Gerald W. wrote: "If someone purposely takes

the life of another, I feel that they should be punished severely. If accidental or without thought I feel they should go through some type of rehab & counseling for an extensive period of time." On voir dire by the trial court, Gerald W. said he would not automatically vote either for or against the death penalty.

The prosecutor on voir dire asked Gerald W. whether he thought "that as a society we should even have the death penalty." Gerald W. replied: "Yes, I believe that there are some murder cases that require the death penalty. Because there are some people that just are killers. Might have had, to me, a criminal life or scrapes with the law, you know." The prosecutor then asked how he would feel "if the person had not done it before." Gerald W. said: "They would be in a different category." Asked whether his ability "to vote for the death penalty in a lot of ways would be determined by the person's prior criminal record," Gerald W. replied: "It would have a lot to do with it." On further questioning, however, Gerald W. added that he could see himself voting for the death penalty when the person did not have a prior criminal record but committed "a very violent premeditated murder." Asked what kinds of things he would look for in making the penalty determination in that situation, Gerald W. said: "The history of what the person was like prior to this murder." The prosecutor then asked this question: "Could you see yourself ever voting for the death penalty in a situation where you have already found the person guilty because they participated in the crime, but they weren't the person who actually pulled the trigger and did the stabbing, whatever?" Gerald W. replied: "I don't think so." He later said, however, that if three people agreed to commit a robbery and decided in advance to kill the robbery victim, he could vote for the death penalty for each of the participants because "one should not get off any lighter as far as sentencing or anything than the other because all three of them—to me, that would like they all shared equally in that crime."

Substantial evidence supports the trial court's finding that the prosecutor could reasonably view Gerald W. as unfavorable on the penalty issue. Although he indicated he was neutral on the death penalty, his answers suggested that in making the penalty determination he would be heavily influenced by the presence or absence of a prior criminal record and that at least initially he was not inclined to impose the death penalty on one who did not personally participate in the killing. In the context of this case, where the defendant lacked a prior criminal record and did not directly participate in the killing, we see no basis to disturb the trial court's finding that the prosecutor's peremptory challenge against Gerald W. was based on his death penalty views and not on his race.

### 3. *Defendant's arguments*

■ Defendant argues that the trial court's findings are not entitled to deference because the trial court did not make " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation.' " (*People v. Fuentes, supra*, 54 Cal.3d at p. 718.) More particularly, defendant asserts the trial court reviewed jury questionnaires as to only seven of the eight Black prospective jurors that the prosecutor had excused by peremptory challenge. We find the record on this point to be inconclusive. The trial court asked defense counsel for his copies of the questionnaires because, as the court said, they were better organized than the court's, and the court mentioned seven of the eight prospective jurors by name, omitting the name of Patricia M. But the trial court may have had its own copy of Patricia M.'s questionnaire already in hand, or defense counsel may have supplied the court with all eight questionnaires. We note that the court later announced it had "look[ed] at all the questionnaires of Black jurors who have been excused." Defense counsel did not challenge this statement. On this record, we find no basis to conclude that the trial court failed to review the questionnaires and the voir dire responses of each of the eight prospective jurors.

■ Defendant also argues that the trial court should have granted the defense motion because the prosecutor failed to give separate reasons for challenging each of the eight Black prospective jurors and because the trial court failed to make separate findings as to each challenged juror. Although we agree that it is generally preferable to have individual reasons and individual findings for each challenged juror, we have never required them. "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*People v. Silva, supra*, 25 Cal.4th at p. 386; see also *People v. Arias, supra*, 13 Cal.4th at p. 137, fn. 17.)

■ Defendant next asserts that the prosecutor's stated reasons for the challenges invited a comparison with the pool of remaining unselected prospective jurors. The prosecutor said: "I also took into account the fact that I believe that all these jurors weren't necessarily opposed to the death penalty, but that I had a pool of jurors out in the audience who I thought were more in favor of the death penalty than these particular jurors." Defendant argues that in view of this statement it became necessary to undertake the comparison that the prosecutor invited.

We note that at trial the defense did not suggest undertaking such a comparison, and indeed defendant's trial attorney stated that at issue were the death penalty views of the challenged Black prospective jurors, not the

views of prospective jurors who had not yet been called into the jury box. The trial court indicated its agreement with this statement. The defense did not protest when the trial court said it had reviewed the questionnaires and voir dire of the challenged jurors, without referring to the unselected jurors remaining in the jury pool. Because the trial court's review of the question-naires and voir dire of the challenged jurors showed that each had expressed views that the prosecutor could reasonably regard as unfavorable on the penalty issue, the trial court apparently concluded, with defense acquies-cence, that there was no need to compare their expressed views with those of the remaining prospective jurors in the jury pool.

Moreover, the comparison that defendant invites hardly seems feasible. Under the jury selection system that the trial court was using, the parties did not know the order in which prospective jurors in the jury pool would be called into the jury box. The number of prospective jurors in the pool, and their identities, changed with the exercise of each peremptory challenge and the summoning of each prospective juror from the pool into the jury box. Defendant has attempted to undertake a comparative analysis in his appellate brief, but it is inconclusive. Defendant does not dispute that at the time of each prosecution peremptory challenge against a Black prospective juror, there remained in the jury pool at least one prospective juror (and usually several) whom the prospector could reasonably regard as more favorable on the penalty issue, and that, during most of the time in question, the prosecu-tor had more remaining peremptory challenges than the defense. Although the prosecutor could never be entirely certain that the challenged Black prospective juror would be replaced by a juror with more favorable penalty views, the prosecutor could reasonably have thought it more likely than not that this would occur.

We conclude, therefore, that defendant has failed to demonstrate error in the trial court's denial of his motion under *Batson v. Kentucky, supra,* 476 U.S. 79, and *People v. Wheeler, supra,* 22 Cal.3d 258.

B. *Challenges to Prospective Jurors for Cause*

Defendant contends that during jury selection the trial court erred in overruling her "for cause" challenges to six prospective jurors and in granting the prosecution's challenges to two prospective jurors.

The same legal standard governs the inclusion or exclusion of a prospective juror. (*People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) A trial court should sustain a challenge for cause when a juror's views would "prevent or substantially impair" the

performance of the juror's duties in accordance with the court's instructions and the juror's oath. (*People v. Earp* (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Mayfield, supra,* 14 Cal.4th at p. 727.) On appeal, we will uphold a trial court's ruling on a challenge for cause by either party "if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." (*People v. Mayfield, supra,* 14 Cal.4th at p. 727; see also *People· v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Mincey, supra,* 2 Cal.4th at pp. 456-457.)

1. *Harold O.*

The trial court properly denied the defense challenge for cause to Prospective Juror Harold O. On voir dire, Harold O. expressed strong feelings in favor of the death penalty, but he also said he would not automatically "go one way or the other" and would follow the law as instructed. Although Harold O. at one point said he would automatically vote for death at the penalty phase unless evidence was introduced to convince him otherwise, the record shows that Harold O. mistakenly thought he was being asked for his views on the appropriate penalty if no evidence was introduced at the penalty phase. When the trial court clarified the question, Harold O. assured the court that he would consider the evidence and mitigating factors. The trial court impliedly resolved any conflicts or ambiguities in Harold O.'s responses by finding that his views on the death penalty would not prevent or substantially impair the performance of his duties as a juror. We will not disturb that finding, which is fairly supported by the record.

2. *Mary F.*

The trial court properly denied the defense challenge for cause to Prospective Juror Mary F. Although Mary F. said she favored the death penalty, she also said she would keep an open mind and would consider life without possibility of parole at the penalty phase. The trial court impliedly resolved any conflicts or ambiguities in Mary F.'s responses by finding that her views on the death penalty would not prevent or substantially impair the performance of her duties as a juror. We will not disturb that finding, which is fairly supported by the record.

3. *Hilyard B.*

Prospective Juror Hilyard B. said he felt strongly that the death penalty should be imposed under certain circumstances, but he also said that he

could set aside his personal feelings and follow the law as instructed, and that the appropriate sentence to be imposed would depend on the particular situation. Hilyard B. stated that although he would give greater weight to the circumstances of the crime and recent mitigating factors, he would consider other factors in aggravation and mitigation as well. These responses do not show that the trial court erred in denying the defense challenge for cause.

Hilyard B. did not answer questions in the juror questionnaire about how he had voted in elections; he explained that he considered that information personal and confidential. We reject defendant's argument that the trial court was required to excuse Hilyard B. because of his failure to answer these particular questions, or that defendant was denied a right to adequate voir dire. Hilyard B. freely answered questions on voir dire about his death penalty views and his ability to obey the court's instructions regarding penalty determination in a capital case. Thus, the defense had adequate opportunity to voir dire Hilyard B. in support of a challenge for cause. (See *People v. Holt* (1997) 15 Cal.4th 619, 661 [63 Cal.Rptr.2d 782, 937 P.2d 213] [stating that reversal of judgment is required only when voir dire was "so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair"].)

### 4. *Katherine K. and Barbara M.*

As defendant concedes, Prospective Jurors Katherine K. and Barbara M. gave contradictory answers on voir dire. When denying the defense challenges for cause, the trial court impliedly resolved those contradictions by finding that their views would not prevent or substantially impair the performance of their duties as jurors, and we will not disturb those findings, which are fairly supported by the record. Although Barbara M. did not disclose in her juror questionnaire that her mother-in-law had been a murder victim 20 years earlier, she disclosed the information on voir dire, and the trial court considered it in denying the defense challenge for cause.

### 5. *Richard R.*

The trial court properly denied the defense challenge for cause to Prospective Juror Richard R. Although during voir dire Richard R. said he thought defense counsel was trying to influence the prospective jurors, he said he would not hold this against the defense and it would not affect his performance as a juror. By denying the defense challenge for cause, the trial court impliedly found that Richard R.'s views would not prevent or substantially impair the performance of his duties as a juror, and we will not disturb that finding, which is fairly supported by the record.

6. *Scott M. and Beverly S.*

■ The trial court did not err in granting the prosecution's challenges for cause to Prospective Jurors Scott M. and Beverly S. As defendant recognizes, they made statements in their juror questionnaires that would disqualify them from serving as jurors in this case. Although their later statements during voir dire may not have been disqualifying, the resolution of these conflicts and contradictions was the task of the trial court. By granting the prosecution's challenges for cause, the trial court impliedly found that these prospective jurors' views would prevent or substantially impair the performance of their duties as jurors, and we will not disturb those findings, which are fairly supported by the record.

C. *Double Jeopardy and Comment on Failure to Testify*

Immediately after the jury was sworn, the trial court recalled that one of the jurors, Fred L., had earlier told the bailiff about reading a newspaper article regarding the case. The court, in the presence of the other jurors, inquired into the matter. When the court asked whether the article had affected his ability to be fair to either side, Juror Fred L. responded: "It would cause me to want the defendant to testify on her own behalf even though she constitutionally doesn't have to, and that would lead me to be prejudiced against her." The court then asked, "In other words, you would expect if the defendant doesn't take the stand and testify in her own behalf, you would hold it against her?" Juror Fred L. replied, "Yes." After a sidebar discussion with the attorneys for both sides, the trial court discharged Fred L. When the court then asked the remaining 11 jurors if any of them had read anything that would cause them to believe that they could not be fair, no one responded.

■ Defendant contends that jeopardy attached when the 12 jurors were sworn, and that therefore the trial court proceedings after the discharge of Juror Fred L. violated her constitutional right under the Fifth Amendment to the federal Constitution to not be placed in jeopardy twice for the same offense. We have held that generally "where a court has indicated that a trial will be conducted with alternate jurors the impanelment of the jury is not deemed complete until the alternates are selected and sworn." (*In re Mendes, supra,* 23 Cal.3d at p. 853.) The trial court here indicated that there would be alternate jurors. Defendant urges us to overrule *Mendes* because, according to defendant, it conflicts with the United States Supreme Court's decision in *Crist v. Bretz* (1978) 437 U.S. 28 [98 S.Ct. 2156, 57 L.Ed.2d 24], holding that jeopardy attaches when jurors are impaneled and sworn. As the Attorney General notes, however, we were aware of and considered the high court's

decision in *Crist* when we decided *In re Mendes,* and we there concluded that our decision was not in conflict with *Crist.* (*In re Mendes, supra,* 23 Cal.3d at pp. 853-854.) We adhere to that view.

We also reject defendant's argument that the statements by Juror Fred L. and those the trial court made in the presence of the full jury constituted improper comments on defendant's failure to testify. Fred L. stated that based on the article he read, he would want defendant to testify "even though [defendant] constitutionally doesn't have to," and that would lead him "to be prejudiced against her." Defendant did not preserve the issue for appeal because she did not make a timely objection in the trial court. (See *People v. Hines* (1997) 15 Cal.4th 997, 1035 [64 Cal.Rptr.2d 594, 938 P.2d 388].) In any event, the specific contents of the article were not discussed in front of the other jurors but only in a sidebar conference with counsel, Juror Fred L.'s comment expressly recognized defendant's constitutional right not to testify, and the trial court instructed the jury not to draw any inferences from a defendant's failure to testify. Accordingly, the statements in question were not constitutionally improper comments on defendant's failure to testify.[2]

### III. GUILT PHASE ISSUES

#### A. *Accomplice Corroboration*

 Defendant contends she is entitled to a judgment of acquittal because the only evidence linking her to the crimes came from the uncorroborated testimony of accomplices James Luna and brothers Marvin and Dondell Lee. As recited earlier, that testimony was as follows: Defendant agreed to pay Luna $50,000 from the proceeds of an insurance policy to kill victim Eldridge. Defendant made arrangements for Luna and brothers Marvin and Dondell Lee to enter the house to kill Eldridge, and for Luna to help her inflict some injuries on herself so it would appear that the killing occurred during a robbery, to kill Eldridge, and to cut off his penis to make the crime look like a "homosexual murder."

 A conviction can be based on an accomplice's testimony only if other evidence tending to connect the defendant with the commission of the

---

[2]Defendant further contends the trial court violated her statutory rights (see Code Civ. Proc., § 231, subd. (a); Pen. Code, § 1089) and her right to due process in allowing the prosecution two peremptory challenges and the defense only one during the selection of a replacement for Juror Fred L. At the time the court dismissed Fred L., defendant had exhausted her peremptory challenges and the prosecution had two remaining. The record thus establishes she received more than her statutory allotment and accordingly suffered no violation of rights. (Cf. *People v. Armendariz* (1984) 37 Cal.3d 573, 579-584 [209 Cal.Rptr. 664, 693 P.2d 243] [reversible error in failing to reopen jury selection and permit exercise of unused peremptory challenges].)

offense corroborates that testimony. (§ 1111.) The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. (*People v. Szeto* (1981) 29 Cal.3d 20, 25 [171 Cal.Rptr. 652, 623 P.2d 213].)

 Here, to corroborate the accomplice testimony, the prosecution presented independent evidence that defendant had a motive to kill Eldridge to obtain possession of the house they owned in joint tenancy and to obtain the proceeds of an insurance policy on Eldridge's life. The prosecution also presented independent evidence that defendant was present in the house when Eldridge was killed and that, although Eldridge was stabbed 44 times, defendant received only superficial wounds, casting doubt on the defense claim that she, like Eldridge, was a victim of a residential robbery. The investigating detective concluded, based on the evidence at the crime scene, that there was a murder, not a robbery that led to a murder. And the prosecution presented independent evidence that accomplice James Luna, who admitted stabbing Eldridge to death, was defendant's coworker and personal friend. Considered together, this evidence adequately corroborated the accomplice testimony.

In addition, the prosecution introduced evidence that on the day before and the day of the murder there were 11 telephone calls between defendant and accomplice Luna collectively lasting more than 100 minutes, and that on the day after the murder there were six calls between them collectively lasting more than 40 minutes. Because evidence of the telephone communications was not the only corroborating evidence, we do not address defendant's contention that the records of the telephone calls between defendant and accomplice Luna, considered in isolation, are insufficient corroboration of the accomplice testimony. (See *People v. Bunyard* (1988) 45 Cal.3d 1189, 1208, fn. 9 [249 Cal.Rptr. 71, 756 P.2d 795].) Meritless, too, is defendant's assertion that the prosecutor stated in closing argument that the telephone records are the best corroborating evidence. The prosecutor stated that the telephone records were the best evidence of a connection between defendant and accomplice Luna, while also noting that the records would require the testimony of a participant witness to give the telephone calls content.

B. *Right to Speedy Trial*

In August 1985, defendant was arrested in Pennsylvania for the murder of Stephen Eldridge in California. She was arraigned in Los Angeles, California, on January 10, 1986. The preliminary hearing began on January 2, 1987, and ended on January 9, 1987. On September 2, 1987, the prosecution filed an amended information charging defendant with attempted murder, solicitation of murder, and murder. The amended information also alleged the special circumstances of murder for financial gain and murder by lying in wait. Defendant was rearraigned, entered a plea of not guilty, and denied the special circumstance allegations. Later, the trial court dismissed the charge of solicitation of murder.

Between defendant's initial arraignment on January 10, 1986, and the commencement of jury selection on August 14, 1989, Defense Counsel Joe Ingber requested and was granted 25 motions for continuances; each time defendant waived her right to a speedy trial. The continuances were based on Ingber's trial commitments in other criminal cases, including capital cases, and the need to prepare for defendant's trial. The prosecutor, as early as December 1987, and on several occasions thereafter, expressed to the court her concern about the trial delay.

■■■■ Defendant contends she is entitled to a dismissal with prejudice because the delay of three years and eight months between her arraignment and the beginning of jury selection violated her constitutional right to a speedy trial. In support, she cites the speedy trial provisions of the federal and state Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) Her argument, however, addresses only the speedy trial provision of the federal Constitution.

The Sixth Amendment to the United States Constitution guarantees that in "all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." In *Barker v. Wingo* (1972) 407 U.S. 514 [92 S.Ct. 2182, 33 L.Ed.2d 101], the high court announced a balancing test in determining whether a defendant's right to a speedy trial under the Sixth Amendment had been violated. It identified four criteria to be considered: (1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. (*Id.* at p. 530 [92 S.Ct. at p. 2191].)

Here, defendant's speedy trial claim fails under the third factor because she not only did not assert her speedy trial right in the trial court, but she repeatedly requested and obtained continuances and waived time for each continuance. (*People v. Seaton* (2001) 26 Cal.4th 598, 633-634 [110

Cal.Rptr.2d 441, 28 P.3d 175].) Anticipating this conclusion, defendant argues that trial counsel Ingber provided ineffective assistance by requesting and agreeing to the continuances of the trial date.

■ A defendant seeking to establish the incompetence of trial counsel must show both that counsel's performance was deficient and that this deficient performance prejudiced the defendant's case. (*People v. Mendoza* (2000) 24 Cal.4th 130, 158 [99 Cal.Rptr.2d 485, 6 P.3d 150].) In assessing the adequacy of counsel's performance, a court must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citations.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 2065, 80 L.Ed.2d 674].) If "the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" (*People v. Kipp* (1998) 18 Cal.4th 349, 367 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

■ Here, defendant fails to establish that trial counsel Ingber's performance was deficient. The record shows that Ingber needed continuances to prepare for the preliminary hearing as well as the trial, to seek or review discovery, and to await completion of accomplice Luna's preliminary hearing. The record belies defendant's assertion that the only grounds for the continuances were Ingber's commitments in other cases. Although defendant asserts that Ingber intentionally delayed the trial to obtain a higher fee, the record does not support this assertion. Because defendant has not shown that trial counsel's performance was deficient when measured against the standard of a reasonably competent attorney, we reject her claim that counsel's requests for continuances denied her the right to effective assistance of counsel.

### C. *Conflict of Interest*

■ Defendant contends she was denied her Sixth Amendment right under the federal Constitution to be represented by counsel free of a conflict of interest. We disagree.

### 1. *Relevant facts*

On October 24, 1989, at the end of the first day of the prosecution's case-in-chief, Defense Counsel Ingber told the trial court that during a

prosecution interview with accomplice James Luna four days earlier, Luna had mentioned having a "relationship" with Ingber. Ingber expressed concern that the prosecution might call him as a witness in this case. Ingber explained that in another case he had represented Randy Howard, who was Luna's cellmate and sexual partner, but he had never represented Luna. When the prosecutor agreed not to bring up the subject of Luna's claimed relationship with Ingber during Luna's direct examination, the trial proceedings continued.

The prosecution's direct examination of accomplice Luna began on November 1, 1989. The next day, on cross-examination by defense cocounsel Burkow, Luna testified that he had a sexual relationship with cellmate Randy Howard from August 1985 until February 1988, and that he had told Howard of the March 1985 attempted murder and the April 1985 actual murder of Eldridge.

On November 8, 1989, during a break in the cross-examination of Luna, and outside the jury's presence, the prosecutor expressed her concern to the trial court about Defense Counsel Ingber's prior representation of Randy Howard. The prosecutor asserted that if Ingber had obtained confidential information from Howard that could be useful in the cross-examination of prosecution witness Luna, Ingber's prior attorney-client relationship with Howard might preclude disclosing such information to his cocounsel, Burkow. The prosecutor suggested that defendant waive any potential conflict of interest.

Ingber then told the trial court that he had not told Cocounsel Burkow anything discussed with Howard. Ingber added: "I spoke with Mr. Luna myself prior to the time I represented Miss McDermott, discussing nothing about the case whatsoever, as a solicitous, gratuitous, favor on behalf of Mr. Howard to speak to Mr. Luna. [¶] That's all of my relationship with Mr. Luna." In Ingber's view, failing to disclose to Cocounsel Burkow any information about Luna's character received from Howard could not be detrimental to defendant. The trial court disagreed, finding a potential conflict of interest. The court then appointed Bruce Hill, an experienced criminal defense attorney, as independent counsel to consult with defendant.

On November 20, 1989, in defendant's presence, Attorney Hill told the trial court he had met with defendant for an hour and a half, 50 minutes of which were spent discussing the subject of the potential conflict of interest presented by Defense Counsel Ingber's prior representation of Randy Howard in a different case. When the court asked defendant whether she still wanted Ingber to represent her, she responded "Yes, I do, your honor." The

court then asked defendant if she understood that because of the potential conflict she ran "the risk of a greater chance of conviction." Defendant replied, "Yes." Defendant also said she understood that in waiving her right to conflict-free counsel she was giving up her right to appeal on the ground of ineffective assistance of counsel relating to a claim of counsel's potential conflict of interest. The following colloquy then occurred:

"THE COURT: All right.

"Having been advised of the right to be represented by an attorney free from conflict of interest, and having understood the dangers and disadvantages in being represented by an attorney with a conflict, do you specifically give up the right to be represented by an attorney who has no conflict of interest.

"THE DEFENDANT: Yes, I do."

When the defense called Randy Howard as a witness, he testified that he had not told Counsel Ingber anything Luna had told him about the case. Howard also said Luna had told him that defendant had hired Luna to kill someone to collect on an insurance policy.

## 2. *Waiver of counsel's conflict of interest*

 The federal and state constitutional rights to the assistance of trial counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) include the right to representation by counsel without any conflict of interest (*People v. Jones* (1991) 53 Cal.3d 1115, 1133-1134 [282 Cal.Rptr. 465, 811 P.2d 757]). When a trial court knows or should know of a possible conflict of interest between a defendant and defense counsel, the court must inquire into the circumstances and take appropriate action. (*People v. Frye* (1998) 18 Cal.4th 894, 999 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Such action may include ascertaining whether the defendant wishes to waive the right to be represented by conflict-free counsel. Although a trial court may refuse to accept such a waiver (*Wheat v. United States* (1988) 486 U.S. 153, 162 [108 S.Ct. 1692, 1698-1699, 100 L.Ed.2d 140]), it is not required to do so (*People v. Carpenter* (1997) 15 Cal.4th 312, 375-376 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Bonin* (1989) 47 Cal.3d 808, 837 [254 Cal.Rptr. 298, 765 P.2d 460]). The defendant's waiver must be a knowing, intelligent act done with awareness of the circumstances and likely consequences, and it must be unambiguous. (*People v. Mroczko* (1983) 35 Cal.3d 86, 110 [197 Cal.Rptr. 52, 672 P.2d 835].)

 Here, the record shows that the trial court fully informed defendant of the potential conflict of interest on the part of Defense Counsel Ingber

and that defendant knowingly, intelligently, and voluntarily gave up her right to be represented by conflict-free counsel. As discussed in detail above, the trial court appointed independent counsel to discuss with defendant the potential conflict of interest, advised defendant of her right to the appointment of different counsel at no expense to her, told defendant that her chances of being convicted were possibly greater if Ingber remained as her counsel, offered to address any questions or concerns defendant might have, and obtained an express statement from defendant waiving her right to conflict-free counsel. We have in the past rejected the contention that the right to conflict-free counsel cannot be waived in capital cases. (*People v. Carpenter, supra,* 15 Cal.4th at pp. 375-376.)

## D. *Effectiveness of Trial Counsel*

Citing to both the state and federal Constitutions, defendant contends she was denied her right to effective assistance of counsel at trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) More specifically, she claims that her trial counsel failed to adequately investigate and prepare her case; failed to move at the close of the prosecution's case for a judgment of acquittal and to object to the prosecution's closing argument on the ground the accomplice testimony was not corroborated; did not present a coherent theory of the case; lacked basic trial skills; presented incomprehensible defenses; bolstered the prosecution's theory of murder for financial gain; bolstered the testimony of accomplice Luna; used vulgar language; expressed personal opinions about defendant's guilt; and conceded defendant's guilt in closing argument.

As we have explained, a defendant claiming ineffective assistance of trial counsel must show both that counsel's performance was deficient and that this deficient performance prejudiced defendant's case. (*People v. Mendoza, supra,* 24 Cal.4th 130, 158.) If counsel's deficiencies were so severe as to result in a complete breakdown of the adversary process, prejudice is presumed. (*United States v. Cronic* (1989) 466 U.S. 648, 656-657 [104 S.Ct. 2039, 2045-2046, 80 L.Ed.2d 657].) Otherwise, the defendant must show prejudice "in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

We reject at the threshold defendant's contention that she is entitled to a presumption of prejudice because her trial counsel's deficiencies resulted in a complete breakdown of the adversarial process. The record shows that defense counsel vigorously represented defendant and subjected the prosecution's case to adversarial testing. As just one example, defense counsel's cross-examination of prosecution witness James Luna lasted eight days.

1. *Claim that defense counsel failed to adequately investigate and prepare case*

In support of her claim that Defense Counsel Ingber failed to investigate and prepare the case, defendant points to Ingber's involvement in trying other cases while representing her, his citation of a disapproved case in a motion, and his failure to timely review discovery by the prosecution. Defendant also asserts that Ingber did not hire an investigator until May 1989 and did not conduct his first field investigation until June 1989, shortly before trial started in August 1989, that Ingber did not interview defense witnesses until the morning of their testimony, that some defense witnesses never spoke to Ingber or his cocounsel, Burkow, before testifying, and that Ingber did not ask for a continuance when accomplice James Luna agreed to testify against defendant one month before trial.

As the Attorney General observes, the appellate record does not support many of these assertions. To show when trial counsel Ingber hired an investigator and began the field investigation, defendant mistakenly relies on trial counsel's funding requests. But these requests only cover the period after the trial court appointed Ingber as defendant's trial counsel. The appellate record does not show what actions Ingber did or did not take during the long period before his appointment when Ingber represented defendant as retained counsel.

Assuming trial counsel Ingber did not interview many defense witness until the day of their testimony, we are not persuaded this establishes deficient performance. Experienced counsel may, for example, choose to rely on an investigator's report or other form of written statements describing the witnesses' anticipated testimony. Because defendant has not shown that trial counsel Ingber failed to adequately investigate or prepare, defendant also has not shown that counsel should have requested additional continuances.

2. *Claim that defense counsel should have moved for judgment of acquittal or objected to prosecution's closing argument*

Defendant faults trial counsel for not seeking a judgment of acquittal when the prosecution rested its case and for not objecting to the prosecutor's closing argument on the ground that the accomplice testimony of James Luna, Marvin Lee, and Dondell Lee was not corroborated. As discussed earlier, there was sufficient corroboration of the accomplice testimony. Because a motion or objection on the ground now asserted by defendant would have been futile, trial counsel's failure to move for acquittal or to object to the prosecutor's argument was not deficient performance. (*People v. Diaz* (1992) 3 Cal.4th 495, 562 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

### 3. *Claim that defense counsel did not have a coherent defense theory*

Defendant accuses her trial counsel of lacking a coherent defense theory, as shown, according to defendant, by counsel's failure to establish that accomplice James Luna might have had a motive for the killing of Eldridge separate and apart from defendant's. Defendant is wrong. The defense did present a coherent theory of the case, namely, that the prosecution could not prove beyond a reasonable doubt that defendant had anything to do with the murder.

### 4. *Claim that defense counsel lacked basic trial skills*

Defendant asserts that her trial counsel lacked basic trial skills. In support, she points to a question by the prosecutor that she claims her counsel should have objected to as leading and as assuming facts not in evidence. She then lists 29 questions defense counsel asked accomplice Luna on cross-examination, claiming that these questions show that counsel was acting as "another prosecutor." Such matters as whether objections should be made and the manner of cross-examination are within counsel's discretion and rarely implicate ineffective assistance of counsel. (*People v. Bolin* (1998) 18 Cal.4th 297, 334 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Here, as we pointed out earlier, defense counsel cross-examined accomplice Luna for eight days and vigorously attacked his credibility in closing argument. The record belies defendant's assertion that her trial counsel lacked basic trial skills.

### 5. *Claim that defense counsel presented "incomprehensible defenses"*

In arguing that defendant's trial counsel presented "incomprehensible defenses," defendant points to (1) counsel's attempt to establish that murder victim Eldridge received only superficial injuries in the earlier nonfatal attack on March 21, 1985, and (2) counsel's examination of Luna's aunt, Alice Gonzales, eliciting her testimony that Luna was at home on April 28, 1985, when Eldridge was killed. As the Attorney General points out, evidence that Eldridge received only superficial injuries during the March 21 attack supported the defense argument that the attack was not an attempted murder, as the prosecution had argued, but instead was part of an attempted robbery. In turn, this supported the defense argument that the later murder of Eldridge occurred during a residential robbery rather than, as the prosecution had argued, to obtain financial benefits for defendant. The testimony of accomplice Luna's aunt was offered not to exculpate Luna from the murder but to impeach Luna by showing that he had manipulated his aunt to induce her to lie on his behalf. This was consistent with the defense strategy to portray Luna as an individual whose testimony completely lacked credibility.

### 6. *Claim that defense counsel "bolstered" prosecution's case*

■ Defendant accuses her trial counsel of bolstering the prosecution's theory that defendant's motive for Eldridge's murder was financial gain, namely, obtaining the proceeds of the life insurance on Eldridge's life and full title to the house they jointly owned. In support, she cites trial counsel's decision to call as witnesses Robin Tratner, Linda Gunderson, and Antoinette Garcia.

Defense witness Robin Tratner was the custodian of records for the bank where defendant maintained an account. Through direct examination of Tratner, defense counsel established that defendant did not have a negative bank balance during the first half of 1985, when Eldridge was killed. Although Tratner testified on cross-examination that defendant had bounced over 100 checks in 1984, the defense succeeded in establishing that defendant's financial situation had improved in 1985.

Defense witness Linda Gunderson, a probate lawyer representing the family of murder victim Eldridge, testified that Eldridge's heirs had filed a claim for the insurance proceeds under the policy that Eldridge had bought naming defendant as a beneficiary. Defendant argues that her counsel's decision to have Gunderson testify was a tactical blunder because it allowed the prosecution, during its rebuttal, to call as a witness defendant's former attorney, Mitchell Egers, who testified that he had written a letter to the insurance company, claiming that defendant was entitled to the proceeds of Eldridge's life insurance as the beneficiary designated on the policy. We do not agree that defendant was significantly harmed by Egers's testimony, or that the testimony was inconsistent with defendant's claim of innocence. If, as defendant claimed, she was not involved in Eldridge's murder, she would be entitled to claim the proceeds of his life insurance.

Defense witness Antoinette Garcia was the sister of Phillip La Chance, who worked with defendant at the La Porte residence. The defense called her as a witness to impeach La Chance's testimony that defendant had asked him to steal Betty La Porte's ring. Garcia testified that La Chance was not working at the La Porte residence when, according to La Chance, defendant had asked him to steal the ring. On cross-examination by the prosecution, Garcia said that La Chance told her that defendant and La Chance had taken Betty La Porte's ring and had tried to sell it. Whether Garcia's testimony was detrimental to the defense is fairly debatable. Although the prosecution's cross-examination of Garcia produced further evidence that defendant had participated in the theft of the ring, that evidence was an out-of-court statement by La Chance, and Defense Counsel Ingber's direct examination of Garcia successfully undermined La Chance's credibility. Because reasonable minds could differ on the value of Garcia's testimony for the defense,

we do not find that Defense Counsel Ingber performed deficiently by calling her as witness. (See *People v. Hines, supra,* 15 Cal.4th at p. 1065.)

Defendant also faults trial counsel for calling as witnesses Randy Howard, Betty Jones, and Dondell Lee who, according to defendant, each gave testimony against her. We reject defendant's claim because she has not shown that there could be no satisfactory explanation for defense counsel's actions. (*People v. Kipp, supra,* 18 Cal.4th at p. 367.) Howard testified that accomplice Luna told him defendant had hired Luna to kill someone for insurance money. As the Attorney General notes, Howard's testimony was consistent with Luna's and was used by the defense in closing argument to show that because the source of the evidence was Luna himself, Luna's testimony could not be independently corroborated. As to Jones, her testimony that Luna told her defendant sometimes would pick Luna up in her car and go out for cocktails was not adverse to defendant, given that Luna and defendant were friends and coworkers. Dondell Lee's testimony that defendant describes as "the 'lady' told Luna to do this or that" might have been offered by defense counsel to show that accomplice Dondell and his brother Marvin, also an accomplice, had concocted a version of events that was not credible.

### 7. Claim that defense counsel used vulgar language and sexual innuendo

██ Defendant accuses trial counsel of using vulgar language and sexual innuendo during the examination of Marvin Lee and Gary Venturini, thus rendering ineffective assistance. We disagree.

The defense played the tape of the July 12, 1985, police interview of accomplice Marvin Lee. The tape apparently contained explicit sexual language, and the questions by defense counsel that defendant now claims were improper all related to that interview. Having reviewed the record, we do not find that Defense Counsel Ingber performed deficiently by referring to and repeating some of the vulgar and offensive language used during the taped interview.

Defendant next asserts trial counsel improperly asked Gary Venturini, who was murder victim Eldridge's former lover, if Venturini's relationship with another former lover was physical, and improperly elicited testimony that the other former lover had died of AIDS. After the prosecution objected, defense counsel rephrased the question to delete any reference to the relationship being physical. Defense counsel could not have anticipated the testimony defendant now claims was offensive, that Venturini's former lover had died of AIDS, because that statement was not responsive to defense

counsel's question, which made no reference to the death of the former lover.

In neither of these incidents has defendant shown incompetent representation at trial. In addition, defendant does not even attempt to show prejudice from the purportedly deficient performance.

 8. *Claim that defense counsel allowed witnesses to express personal opinions of defendant's guilt*

 ■ Defendant faults her trial counsel for allowing three defense witnesses (Linda Gunderson, Curt Livesay, and Agnes Gordon) and two prosecution witnesses (Twyla Hacker and Carol Bond) to testify as to their opinion of her guilt. The record does not support defendant's claim.

As mentioned previously, defense witness Linda Gunderson was the attorney for the family of murder victim Eldridge. On cross-examination, the prosecution asked whether defendant, the beneficiary of the insurance policy taken out on Eldridge's life, was disqualified from receiving the insurance proceeds because "she had, in your mind, murdered your client . . . ." Gunderson never answered the question, however, because the trial court sustained defense counsel's prompt objection, and the prosecutor ended her questioning. Thus, contrary to defendant's assertion, Gunderson expressed no opinion on defendant's guilt.

Defense witness Curt Livesay was the assistant district attorney in charge of determining whether the prosecution should seek the death penalty in special circumstance cases. He testified about the terms of accomplice Luna's plea agreement. On cross-examination by the prosecution, Livesay explained that the purpose of the plea bargain was to have Luna tell the jury about defendant's role in the killing, and that without the plea bargain Luna was certain to have invoked his right against self-incrimination. Livesay did not give his personal opinion on defendant's guilt, and defense counsel had a legitimate tactical reason for calling Livesay as a witness: to attempt to undermine prosecution witness Luna's testimony by showing that the prosecution had given him a favorable deal in exchange for his testimony against defendant. In any event, defendant was not prejudiced. Undoubtedly, the jury was aware that the prosecution, as the charging party, was convinced of defendant's guilt.

Defense witness Agnes Gordon was a police officer who spoke to defendant shortly after Eldridge's murder, and she testified that defendant was not as upset after that murder as Gordon would have expected. Contrary to defendant's claim, she expressed no personal opinion on defendant's guilt.

Twyla Hacker, a friend of defendant's, testified as a prosecution witness that police officers told her they thought defendant was guilty; contrary to defendant's assertion, she expressed no opinion about defendant's guilt.

Prosecution witness Carol Stanford Bond, a friend of murder victim Eldridge, testified that she was not on friendly terms with defendant before the murder and that she liked defendant even less at the time of her trial testimony. Contrary to defendant's claim, Bond expressed no view of defendant's guilt.

9. *Claim that defense counsel conceded defendant's guilt in closing argument*

 Defendant accuses her trial counsel of conceding her guilt in closing argument, thereby rendering ineffective assistance. We find no concession of guilt and no deficient performance in counsel's argument to the jury.

First, defendant asserts that defense counsel told the jury there was no defense. That is not what defense counsel said, however. The prosecution in its closing argument had attempted to ridicule the defense by characterizing as purported or attempted defenses the testimony about an AIDS death, about accomplice Luna having been at home during the murder, about the possibility of two knives being used in the killing, and about the insurance claim submitted by murder victim Eldridge's family. Defense counsel argued that the prosecutor had inaccurately characterized the defense. Considering defense counsel's argument as a whole, a reasonable juror would have understood that the defense theory was simply that the prosecution had failed to prove defendant's involvement in the murder beyond a reasonable doubt.

Second, defendant notes that at the outset of his argument to the jury, defense counsel thanked the jury for being attentive, regardless of how they voted. Defendant claims that by this statement defense counsel told the jury it did not matter how the jury voted on defendant's guilt. No reasonable juror would have so understood counsel's statement, particularly when counsel thereafter proceeded to vigorously argue on defendant's behalf that the prosecution had not established her guilt beyond a reasonable doubt.

Third and last, defendant faults counsel for likening defendant's decision not to testify at trial to a coach's decisions in a football game. What counsel said was that just as a football coach must decide which players to use during a football game, so also an attorney must use professional judgment to decide whether a defendant should testify. There was a legitimate tactical purpose for this argument, which was to reduce the risk that the jury would draw some inference of guilt from defendant's failure to testify.

### E. *Admission of Videotape*

 The jury was shown an 18-minute videotape of the crime scene made by police officers shortly after they arrived there. Defendant objected to the videotape as being more prejudicial than probative. (Evid. Code, § 352.) The videotape contained a 30-second view of the victim's groin area showing that his penis had been cut off. The trial court, after reviewing the tape in its entirety, ruled that it would admit the tape into evidence if the scene showing the victim's genital area were to be shortened and if the sound, except for a portion recording the sound of barking dogs, were to be turned off. Defendant contends that the tape was not shortened and that the sound was not turned off, so that the jury could hear police officers laughing in the background. The Attorney General states that the prosecution turned off the videotape after a brief view of the victim's mutilated groin. The Attorney General also asserts that except for the segment recording the barking dogs, the sound portion of the video was not played.

It is not necessary to resolve the dispute between the parties regarding what portions of the videotape were shown to the jury or whether the sound of the tape was turned on or off. We have reviewed the entire videotape, including the audio portion, and find nothing in it that is unduly gruesome or inflammatory. (See *People v. Mendoza, supra,* 24 Cal.4th at p. 171.) It consists largely of exterior views of the house in which Eldridge was killed. The portion depicting the house's interior contains mostly views of the various rooms. The portion showing the victim's body is not particularly gruesome: There is very little blood shown on or near the body. In the portion of the tape showing the victim's mutilated groin, no blood is apparent. Although unpleasant, the image is not shocking. The trial court did not abuse its discretion in admitting the videotape. (See *People v. Scheid* (1997) 16 Cal.4th 1, 20 [65 Cal.Rptr.2d 348, 939 P.2d 748].)

We see no reason to criticize the trial court for not watching the videotape again with the jury. With respect to defendant's claim that police officers could be heard laughing in the background, the sound of laughter can only be heard briefly, and it is not clear that the person laughing is a police officer. Thus, the audio part of the videotape in which laughter may be heard would not have prejudiced the jury.

### F. *Admission of Prior Bad Acts Evidence*

Phillip La Chance, who had worked with defendant in caring for the disabled Lee La Porte, testified over defense objections to two prior instances of misconduct by defendant. In the fall of 1984, probably during the months of September and October, defendant told La Chance she needed

money to pay bills and discussed with him a plan to steal a ring from Betty La Porte so they could sell it. Around the same time, defendant asked La Chance, who sometimes handled Betty La Porte's banking matters, to get Lee La Porte to sign a check so they "could clear out the checking account." The prosecutor argued that the evidence was relevant to show not only defendant's tendency to employ others to commit crimes for her but also her desperate need for money, which also led her in this case to arrange for Eldridge's murder so she could collect on the insurance policy on his life. The trial court instructed the jury that the evidence was admitted only for the purpose of establishing a possible motive for the murder of Eldridge, and not to prove that defendant had a bad character or a predisposition to commit crimes.

 Defendant contends the trial court violated her right to due process by admitting La Chance's testimony because the evidence that she suggested to La Chance that they steal Betty La Porte's ring and embezzle funds from the La Portes' bank account had no logical tendency to show that defendant had Eldridge killed to get insurance proceeds and the house she held in joint tenancy with him.

 Generally, evidence of a defendant's poverty or indebtedness is inadmissible to establish a motive to commit robbery or theft, "because reliance on poverty alone as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence is considered out-weighed by the risk of prejudice." (*People v. Wilson* (1992) 3 Cal.4th 926, 939 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Evidence that a defendant committed other crimes may be admitted when relevant to estab-lish a motive for the commission of the charged offense or a common plan or design (Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393-394 [27 Cal.Rptr.2d 646, 867 P.2d 757]), but only if the offenses share common features (*People v. Ewoldt, supra,* at pp. 402-403). We do not need to decide here, however, whether the trial court erred in admitting the evidence because its admission did not prejudice defendant. The testimony was relatively brief and the trial court limited its prejudicial impact by instructing the jury that the evidence was not admis-sible to prove bad character or predisposition to commit crimes. (See *People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

Defendant also argues that the trial court should have excluded La Chance's testimony because he was an accomplice to the acts of misconduct about which he testified, and his testimony was not corroborated. We disagree. For purposes of the corroboration requirement, an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice

is given." (§ 1111.) Because La Chance had nothing to do with the earlier attempted murder and the later murder of Stephen Eldridge, the only crimes charged here, he could not be prosecuted for those crimes, and thus he was not an accomplice whose testimony required corroboration.

Finally, defendant contends that La Chance's testimony was inadmissible because his testimony about defendant's plan to steal money from the La Portes' bank account constituted the crime of solicitation to commit grand theft, an offense that must be proven either by the testimony of two witnesses, or by one witness whose testimony is corroborated. (§ 653f, subd. (f).) But the proof requirements of section 653f are inapplicable here, for the prosecution offered La Chance's testimony not to prove a violation of section 653f, but to show defendant's tendency to have others commit crimes for her and to show her desperate need for money, evidence the prosecution argued was relevant in this case.

### G. *Cumulative Effect of Alleged Errors*

Defendant argues that her convictions for attempted murder and murder should be reversed because of the cumulative effect of the errors at the guilt phase. We disagree. Whether considered separately or in combination, the few errors that occurred during the guilt phase of defendant's trial, all of which we discussed earlier, did not prejudice defendant and therefore do not require reversal.

### IV. PENALTY PHASE ISSUES

### A. *Corroboration of Aggravating Evidence*

 Accomplice James Luna testified as a prosecution witness at the penalty phase. He said that defendant had asked him to beat up Dewayne Bell so she could replace Bell as a caretaker for Lee La Porte, an invalid. Luna took two men with him to Bell's apartment, where they beat Bell and cut his face. They fled when Bell started screaming. Defendant contends the trial court should not have admitted Luna's testimony because it was not corroborated.

 When, as here, the prosecution calls a witness to testify at the penalty phase about the defendant's prior violent conduct, there must be corroboration of that testimony. (*People v. Mincey, supra,* 2 Cal.4th at p. 461.) The jury was so instructed here. As we have observed, corroborating evidence may be slight and entirely circumstantial. (*People v. Szeto, supra,* 29 Cal.3d at p. 27.) It must tend to implicate the defendant by relating to some act or fact that is an element of the crime, but it need not be sufficient in itself to establish every element of the crime. It is sufficient if it

substantiates enough of the accomplice's testimony to establish his credibility. The finding of the trier of fact on the issue of corroboration is binding on a reviewing court unless the evidence should not have been admitted or it does not reasonably tend to connect the defendant with the commission of the crime. (*Ibid.*)

 Here, Luna's penalty phase testimony was adequately corroborated by the testimony of Dewayne Bell, who testified as a prosecution witness at the penalty phase. Bell described the three individuals who attacked him as a Hispanic man and two Black men. Bell recalled that defendant had previously introduced him to one of the Black men who had attacked him. When Bell saw Luna in the courtroom, Bell recognized him as another person that defendant had introduced him to and he said that Luna "look[ed] similar" to the Hispanic individual who had attacked him. Additional corroboration was provided by evidence of the plan's success in having Bell replaced by defendant as caretaker of the invalid Lee La Porte: After the attack on Bell, the La Portes discharged him and hired defendant.

## B. *Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in prosecutorial misconduct during her closing argument at the penalty phase by: (1) using inflammatory epithets, (2) arguing the absence of mitigation evidence was aggravating, (3) implying defense counsel fabricated evidence, (4) making references to the Bible, (5) misstating the law, (6) misstating the evidence, (7) arguing defendant's character as aggravating, (8) engaging in bad faith by arguing defendant would be dangerous in prison, (9) making a plea to impose the death penalty based upon gut instinct, and (10) asserting that defendant was more deserving of the death penalty because she is a woman. At trial, defendant objected only to the first three of these claimed instances of prosecutorial misconduct.

 Generally, " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) This general rule, however, does not apply if a defendant's objection or request for admonition would have been futile or would not have cured the harm caused by the misconduct; nor does it apply when the trial court promptly overrules an objection and the defendant has no opportunity to request an admonition. (*Ibid.*) Defendant here fails to show that any of these exceptions applies to any of the seven instances of alleged prosecutorial misconduct to which she did not object at trial. Thus, she may not now raise these claims.

Arguing that we should excuse her trial counsel from the legal obligation to object to prosecutorial misconduct, defendant cites our decision in *People v. Hill, supra,* 17 Cal.4th 800. Defendant's reliance on *Hill* is misplaced, however. There the prosecutor subjected the defense "to a constant barrage of . . . unethical conduct, including misstating the evidence, sarcastic and critical comments demeaning defense counsel, and propounding outright falsehoods," and the trial court consistently failed to curb the prosecutor's excesses. (*Id.* at p. 821.) Such egregious conduct did not occur here.

We also reject defendant's claim that her trial counsel was ineffective for not objecting to the alleged prosecutorial misconduct. Because the record does not show the reasons for counsel's actions, defendant's claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

### 1. *Epithets*

 At the penalty phase, the prosecutor began her closing argument to the jury with these comments: "The time has now arrived for us to . . . look exactly at what one human being did to another. [¶] And I use the term human being in a literal sense because I'm not so sure that Maureen McDermott really should be categorized as a human being. [¶] Because human beings have a heart and human beings have a soul. And nobody with a heart and nobody with a soul could have done what Maureen McDermott has done in this case."

The trial court overruled defense counsel's objection that it was improper for the prosecutor to argue that defendant was not a human being. The court explained that the prosecutor did not use the word "animal," adding that "it's proper for a prosecutor to argue what someone did was inhumane or inhuman."

As we have said, we do not condone the use of opprobrious terms in argument, but such epithets are not necessarily misconduct when they are reasonably warranted by the evidence. (*People v. Hawkins* (1995) 10 Cal.4th 920, 961 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People v. Sandoval* (1992) 4 Cal.4th 155, 180 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Here, the prosecutor's remarks, which the trial court understood as referring to conduct by defendant that was inhumane, did not exceed the permissible scope of closing argument in view of the evidence presented of, among other things, defendant's deliberate and cold-blooded planning of the killing of Stephen Eldridge. (See, e.g., *People v. Hawkins, supra,* at p. 961 [finding no prosecutorial misconduct in describing the defendant as "coiled like a snake" and in

comparing the act of sentencing defendant to life in prison as akin to "putting a rabid dog in the pound"]; *People v. Sully* (1991) 53 Cal.3d 1195, 1249 [283 Cal.Rptr. 144, 812 P.2d 163] [reference to the defendant as a "human monster" and a "mutation"].)

Defendant also cites as improper the prosecutor's comments in closing argument describing defendant as "a mutation of a human being," a "wolf in sheep's clothing," a "traitor," a person who "stalked people like animals," and someone who had "resigned from the human race." Because defendant did not object to these remarks or request an admonition at trial, she may not now challenge these statements. (*People v. Hill, supra,* 17 Cal.4th at p. 820.) Moreover, when considered in the context of the planning and execution of Eldridge's murder, these references are within the permissible bounds of argument, and in any event would not have had such an impact "as to make it likely the jury's decision was rooted in passion rather than evidence." (*People v. Thomas* (1992) 2 Cal.4th 489, 537 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

Defendant asserts that the prosecutor committed misconduct by comparing her to a Nazi working in the crematorium by day and listening to Mozart by night. We find no misconduct in these remarks. The prosecutor was not comparing defendant's conduct in arranging Eldridge's murder with the genocidal actions of the Nazi regime. Rather, the prosecutor was arguing that human beings sometimes lead double lives, showing a refined sensitivity in some activities while demonstrating barbaric cruelty in others. In the context of this case, where the evidence showed defendant to be both a caring and competent nurse and a person capable of plotting a brutal murder, the argument was appropriate.

Finally, defendant claims the prosecutor committed misconduct by comparing defendant to a germ, a mad dog, and a snake. These remarks were a permissible form of argument designed to show the circumstances in which society may be justified in taking one life to protect the lives of others. (*People v. Hawkins, supra,* 10 Cal.4th at p. 961; *People v. Thomas, supra,* 2 Cal.4th at p. 537; *People v. Sully, supra,* 53 Cal.3d at p. 1249.)

2. *Alleged Davenport error*

Defendant contends the prosecutor improperly argued that the absence of statutory mitigating factors made the crime more aggravated. (See *People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) Not so. When the prosecutor discussed the statutory mitigating factors, she merely noted their absence in this case. She did not argue that this absence transformed the mitigating factors into aggravating factors. This

argument was proper. (*People v. Millwee* (1998) 18 Cal.4th 96, 152 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Hines, supra,* 15 Cal.4th at p. 1064.)

　3. *Claim that prosecutor implied fabrication of evidence by defense counsel*

 Defendant complains about a comment the prosecutor made in closing argument when, after urging the jury not to extend sympathy to defendant, the prosecutor said: "It is the job of the defense attorneys in this case to *create* sympathy during this phase for Maureen McDermott just like in the guilt phase it's their job to argue that she is not involved in these crimes." (Italics added.) The trial court overruled defense counsel's objection that the prosecutor's use of the word "create" implied that defense counsel would present arguments without any evidentiary basis. The court found nothing in the prosecutor's comment suggesting fabrication of evidence by defense counsel for the purpose of portraying defendant as a person deserving of the jury's sympathy. We agree that, viewed in context, the prosecutor's comment did not impugn the integrity of the defense.

## C. *Instruction on Accomplice Punishment*

At the guilt phase of the trial, the prosecutor told the jury that accomplices Marvin and Dondell Lee had received immunity from prosecution for the murder of Stephen Eldridge, and that accomplice James Luna agreed to a plea bargain under which, in return for his truthful testimony at defendant's trial, he was to receive a sentence of life in prison without possibility of parole for his role in Eldridge's murder.

At the penalty phase of the trial, over defense objection, the trial court granted the prosecution's request to instruct the jury in this language: "You may not consider either the punishment or absence of punishment for the following accomplices: James Luna, Marvin Lee and Dondell Lee in determining the appropriate penalty for the defendant Maureen McDermott in this case." In discussing the matter with counsel for both parties, the trial court stressed that the instruction did not preclude defense counsel from mentioning the sentence or absence of sentence for any of the accomplices, but the court barred defense counsel from arguing to the jury that the punishment or the absence of punishment for the accomplices would justify leniency for defendant by not rendering a verdict of death against her.

 Defendant contends that this instruction was improper because: (1) the instruction nullified the trial court's instruction on sympathy, as sympathy for defendant would "naturally" be aroused by the disparate punishment

given the accomplices; (2) this court has never held that the defense may not ask a jury to show mercy to a defendant in light of the punishment given the accomplices; (3) the instruction was fundamentally unfair because the prosecutor at the guilt phase was allowed to argue the life sentence given to Luna and the complete immunity granted to both of the Lee brothers were morally justified; and (4) the instruction made the judgment of death arbitrary and capricious as well as unreliable in violation of the Eighth Amendment to the federal Constitution. We disagree.

We have consistently held that evidence of an accomplice's sentence is irrelevant at the penalty phase because "it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition." (*People v. Cain* (1995) 10 Cal.4th 1, 63 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; see also *People v. Hamilton* (1989) 48 Cal.3d 1142, 1183, fn. 26 [259 Cal.Rptr. 701, 774 P.2d 730].) Nothing in the challenged instruction precluded the jury from considering sympathy for defendant in deciding the appropriate punishment for her crimes. Nor did the instruction nullify the standard instruction the court gave on sympathy, which provides that the jury may "consider sympathy or pity" for a defendant as a mitigating factor.

Citing the high court's decision in *Parker v. Dugger* (1991) 498 U.S. 308 [111 S.Ct. 731, 112 L.Ed.2d 812], defendant argues "evidence of disparity of sentencing is indeed mitigating evidence and closing argument which emphasizes the disparity is appropriate." We rejected a similar contention in *People v. Cain, supra,* 10 Cal.4th at page 63: ". . . *Parker* did not hold evidence of an accomplice's sentence must be introduced in mitigation at the penalty phase, or that a comparison between sentences given codefendants is required. [Citation.] The *Parker* court merely concluded a Florida trial judge, in sentencing the defendant to death, had in fact considered the nonstatutory mitigating evidence of the accomplice's sentence, as under Florida law he was entitled to do. [Citation.] *Parker* does not state or imply the Florida rule is constitutionally required, and California law is to the contrary; we have held such evidence irrelevant because it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition. [Citations.]"

D. *Claim of Cumulative Error*

We reject defendant's contention that the cumulative effect of errors at the penalty phase requires reversal of the death judgment. As we have shown, there was no error.

E. *Automatic Motion to Modify the Verdict*

██ "Under section 190.4, subdivision (e), a capital defendant is deemed to have automatically applied for a sentence modification. In ruling

on the application, the trial judge must independently reweigh the evidence of aggravating and mitigating circumstances and determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict." (*People v. Mincey, supra,* 2 Cal.4th at p. 477.)

Defendant contends the trial court erred in considering the circumstances of the crimes and the assault on Dewayne Bell in ruling on the automatic motion to modify the verdict of death. Defendant asserts that the trial court "did not appreciate the well-settled law regarding the accomplice corroboration rule." Not so. Defendant's argument assumes that her earlier contentions at both the guilt and penalty phases regarding accomplice corroboration were correct, and that the prosecution failed to present adequate corroborating evidence. We have rejected those arguments. The trial court's statement on the record when it denied the motion shows that it independently reweighed the evidence and determined that the weight of the evidence supported the jury's verdict. (See *People v. Rodrigues, supra,* 8 Cal.4th at p. 1196.) No more was required.

### DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 30, 2002, and the opinion was modified to read as printed above.