Filed 8/21/15  P. v. Lopez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEXANDER LOPEZ,<br><br>    Defendant and Appellant. | B256489<br>(Los Angeles County<br>Super. Ct. No.  MAO56682) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Naranjo, Judge.  Affirmed in part, vacated in part and remanded with directions.

Law Offices of James Koester and James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Alexander Lopez was convicted of four counts of willful, deliberate, premeditated attempted murder, including enhancements for personal

weapon use and great bodily injury (GBI), and sentenced to consecutive terms of imprisonment for each count. On appeal, he contends: (1) there was insufficient corroborating evidence from sources other than his accomplice to support the verdicts; (2) substantial evidence did not support that the injury to one of the victims comprised GBI; (3) the finding of premeditation must be vacated because the jury was not provided verdict forms to indicate a finding of nonpremeditated attempted murder; (4) the trial court erred in denying appellant's motion to bifurcate trial of the gang enhancement allegation; (5) the trial court erred in permitting the prosecution to introduce evidence of "provocative" and "inflammatory" predicate acts to support the gang enhancement; (6) trial counsel rendered ineffective assistance when he failed to object to or request a limiting instruction for certain hearsay evidence pertinent to premeditation; (7) trial counsel rendered ineffective assistance when he failed to object to the introduction of evidence concerning the predicate acts; and (8) the trial court failed to exercise its discretion in selecting consecutive rather than concurrent sentences for the four counts.

The Attorney General concedes, and we agree, that the trial court failed to recognize and exercise its discretion in sentencing. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Information*

Appellant Alexander Lopez was charged by information with the attempted, willful, deliberate and premeditated murders of Duane Maldonado (Penal Code, § 664, subd. (a), count one), Robert Williams (count two), Steven Tillman (count

2

three) and Duante Andrews (count four).[1]  It was further alleged that a principal personally and intentionally discharged a firearm which proximately caused GBI to Duane Maldonado within the meaning of section 12022.53, subdivisions (d) and (e)(1); that a principal personally and intentionally discharged a firearm within meaning of section 12022.53, subdivisions (c) and (e)(1); that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e); and that appellant suffered a prior conviction (robbery in 2012) for purposes of section 1170.12, subdivisions (a) through (d), section 667, subdivisions (b) through (i), and section 667, subdivision (a)(1).

B. *Evidence at Trial*

1. *Prosecution Evidence*

a. *Duane Maldonado's Testimony*

On May 5, 2012, at approximately 1:00 a.m., Duane Maldonado, his friend Robert Williams and his cousin Steven Tillman went to pick up Williams's weight bench from a carport at an apartment complex in Palmdale.[2]  They were confronted by two Hispanic men, one of whom was sitting on the bench.  The seated man told Maldonado and his companions they could not have the bench and said that "no niggas belong in this building."

From a group of photographs he was later shown by detectives, Maldonado identified the man who spoke as former codefendant Christian Linares. Maldonado described the second man as Hispanic, five feet, seven inches tall,

---

[1]    The information named Christian Linares as a co-defendant in all the counts.  Prior to trial, Linares pled "no contest" to assault with a firearm as an aider and abettor. Undesignated statutory references are to the Penal Code.

[2]    Maldonado initially testified that he, alone, accompanied Williams.  In addition, former co-defendant Linares stated in an interview with detectives that "[t]wo . . . dudes" had come to pick up the bench.

weighing about 140 pounds. He did not identify appellant in any photographic lineup, and in court testified appellant was not the second man. Maldonado and his companions exchanged heated words with the two Hispanic men before leaving.

Maldonado, Williams and Tillman returned to the apartment at approximately 11:30 p.m., accompanied by another man, Dante Andrews. Earlier in the evening, they had been drinking and Williams left for a brief period. When Williams returned to the group, he told the other three men that the "'guys over there'" had said they could get the bench. The four men approached the apartment building, walking close together. As they rounded the corner to the carport where the weight bench was located, someone -- later identified as appellant -- shot at them five or six times. Maldonado testified that he saw two people dressed in black, and was able to determine that the shooter was using a handgun. Maldonado claimed that he did not hear anyone say anything, did not recognize either of the men, and could not describe them.[3] He did not recall identifying Linares from a photograph or telling a detective that Linares was one of the two men, but not the shooter.

Maldonado was shot in his left thigh. He ran down the street to a friend's apartment and told him to call 911. Once there, he collapsed. He was in the hospital overnight. When asked if the incident was traumatic, he replied "[n]ot really. I just got shot in the leg," explaining that he had been shot twice before.

---

[3]     Maldonado testified that he was not a "snitch" and that he would not like to see the man who shot him in jail, preferring to "deal with it" on the street. He further testified he would not identify the shooter, even if he knew his identity, due to the potential for retaliation against himself or his children.

4

### b. *Avimael Zelaya Lopez's Testimony*

Avimael Zelaya Lopez (Zelaya), appellant's brother, testified appellant was a member of a gang called "Down as Fuck" (DAF). Appellant's moniker was "Lil' Gee." He had previously been known as "Sonik."[4] Linares and appellant had been friends for eight or nine years. Appellant called Linares "Wicked."

Zelaya shared a room with appellant. On May 5, appellant told Zelaya he was going to a friend's house in Palmdale. Appellant returned home at approximately 1:30 a.m. on May 6. He knocked on the window to have Zelaya let him in. Zelaya did not see a gun at that time. However, after appellant was arrested, Zelaya found a .32 caliber handgun in the bedroom, hidden inside a padded kick stand. There was no magazine in the gun. Zelaya placed the gun in a box on a shelf in the room. He believed the gun belonged to appellant, but did not have any discussions with appellant about it.

### c. *Linares's Interview and Testimony*

Linares was arrested on June 28, 2012, and interviewed by detectives. An audiotape of the interview was played to the jury. Linares admitted being a member of DAF and using the moniker "Wicked." At first, he denied knowing an "Alex" whose moniker was "Little G," "Sonic," or "Little Sonic," even after the detectives reminded him that he and appellant had been pulled over for speeding in September 2011. After further questioning, Linares said that he and appellant had been present when "[t]wo [B]lack dudes" came to collect the weight bench, and that appellant had spoken to one of them. He said that appellant had "let [the men] know who he [wa]s" -- told them his gang nickname -- in that encounter, but denied that either he or appellant had "got[ten] into it" with the men. Linares told

---

[4]     Appellant's former nickname is sometimes spelled "Sonic."

the detectives that appellant shot the "dudes" when they came back to get the bench. Linares denied saying "[t]hat's them" when the men approached, or that he and appellant were expecting the men to return. He claimed that the men "came out of nowhere" and that "everything happened in an instant." When asked the reason for the shooting, he claimed appellant was "just pissed off all day."

When called by the prosecution to testify at trial, Linares admitted pleading "no contest" to charges arising from the May 6 shooting, but denied being involved. He stated he accepted the plea bargain in order to avoid threatened substantial prison time. He initially claimed not to remember anything that happened on May 5 and 6, 2012 or anything he said to the detectives in the June 28, 2012 interview. When confronted with a transcript or audiotape of the interview, he acknowledged having given the detectives information about the shooting and the shooter. Linares testified he had been a member of DAF in the past, and said that it meant "[d]eath" to testify against a fellow gang member. He stated appellant was a friend of eight years, but not a fellow DAF member. He denied ever seeing appellant with a gun. But Linares also testified that he told the detectives the truth in the interview.

### d. *Detective Anthony Delia's Testimony*

Detective Anthony Delia testified as both an investigator and the gang expert. He interviewed Maldonado after the shooting. Maldonado identified Linares as the man standing next to the shooter. Detective Delia was also one of the detectives who interviewed Linares after his arrest. During the interview, the detectives showed Linares a picture of appellant and Linares identified him as the shooter. Linares told the detectives that appellant used "[a] 32." Linares was then shown a picture of the gun found in appellant's room and identified it as the one used in the shooting.

6

Detective Delia testified concerning the search of appellant's room and the .32 caliber handgun recovered. He further testified that the search uncovered a magazine fitting the gun in a different location in the room. Detective Delia also presented a picture of Maldonado's wound to the jury, describing it as a "through and through." The bullet that went through Maldonado's thigh was never recovered, nor did investigators find any shells at the scene.

Detective Delia identified appellant and Linares as DAF members from field identification cards, including cards prepared after the September 2011 traffic stop. In addition, both appellant and Linares had DAF tattoos and Linares had admitted being a DAF member. DAF was an Hispanic criminal street gang operating in the Antelope Valley with approximately 100 members. Asked about DAF's primary activities, he replied: "[t]hey have several, but the main activities they're involved in would be narcotic sales, assaults, shootings, murder, vandalisms." Detective Delia also presented documentary evidence of two predicate acts to substantiate that DAF was a criminal street gang. The first document indicated that "defendant Jorge Linares, . . . on or about August 30th of 2009, . . . committed the . . . crimes of murder." The second document indicated that on May 10, 2008, DAF gang member Oscar Flores "committed the crimes of attempted murder and assault with a firearm." The detective was not asked to elaborate or describe the crimes in any detail, and did not do so. The next day, he confirmed that "the primary activities of the DAF members are assaults, drug cases, and the list [he] gave."

Detective Delia explained the importance of "respect" to a gang member. He testified that committing a violent crime allows the member to earn respect and status within the gang. It helps the gang by creating fear in the community and causing victims of crimes to be reluctant to assist law enforcement. He described the practice of staring a gang member down or "mad dogging," and explained it would be seen as disrespectful. A gang member who felt disrespected would likely

7

retaliate in a violent fashion, including killing the person who had been disrespectful.

Detective Delia further explained that gang culture forbids members from "snitch[ing]" on one another. A member who snitches could be retaliated against. In addition, gang members are expected to back up fellow members when they commit crimes.

Provided a hypothetical tracking the facts of the case, Detective Delia opined that the shooting was gang-related and perpetrated for the benefit of, at the direction of, and in association with DAF.

### 2. *Defense Evidence*

The defense called gang expert Martin Flores. He testified that "mad dogging" could result in someone being killed, but would not "automatically warrant a reaction." He further testified that crimes committed by gang members are not always committed for gang purposes, and that committing a violent crime does not always engender respect. When given a hypothetical involving the facts of the case, he opined that any reaction by the gang member in his attempt to retain the weight bench would likely be personal rather than gang-related.[5]

### C. *Verdict and Sentencing*

The jury found appellant guilty of attempted willful, deliberate and premeditated murder on all four counts. It found true that he personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e), that he personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1), and that he personally and intentionally

---

[5] Flores agreed that appellant was a DAF member.

discharged a firearm which caused GBI within the meaning of section 12022.53, subdivisions (d) and (e)(1).[6] The jury also found appellant guilty on four counts of the lesser related offense of assault with a firearm (§ 245, subd. (a)(2)). The jurors could not reach a decision on the gang allegation, and that allegation was subsequently dismissed. The court found true that appellant had suffered a prior conviction for a serious felony -- the 2012 robbery.

The court sentenced appellant to a term of 176 years to life. It selected count one as the primary term and sentenced appellant to 14 years to life for the attempted premeditated murder (seven years to life, doubled), plus a consecutive term of 25 years to life for the personal discharge of a firearm causing GBI enhancement and a consecutive term of five years for the section 667, subdivision (a)(1) enhancement for a total of 44 years. It imposed identical sentences for the remaining three counts.[7] Appellant was given credit for 801 days in custody, including 697 actual days and 104 days of good time/work time credit. This appeal followed.

## DISCUSSION

A. *Corroboration of Accomplice Testimony*

Maldonado -- the sole witness to the crime to testify at trial -- did not identify appellant as one of the two men involved in the shooting. The only person identifying appellant as the shooter was his accomplice and former codefendant, Linares. Under California law, "[a] conviction can not be had upon the testimony

---

[6] The verdict forms erroneously stated that appellant was charged with proximately causing "great bodily injury and death." The jurors requested clarification and the court informed them: "'Since this is an attempted murder case, death is not applicable.'"

[7] The court imposed and stayed sentences for the lesser related offenses which we do not detail because they are not at issue in this appeal. In addition, various fines were imposed.

9

of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ."[8] (§ 1111; see *People v. Cuevas* (1995) 12 Cal.4th 252, 261 [testimony of an accomplice "by itself is insufficient as a matter of law to support a conviction"].)  Appellant contends Linares's statements were insufficiently corroborated and that his convictions must therefore be reversed.  For the reasons discussed, we disagree.

"To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. [Citation.]" (*People v. Perry* (1972) 7 Cal.3d 756, 769, overruled on another ground in *People v. Green* (1980) 27 Cal.3d 1; accord, *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128.)  The corroborating evidence may be "'circumstantial or slight and entitled to little consideration when standing alone.'" (*People v. Abilez* (2007) 41 Cal.4th 472, 505, quoting *People v. McDermott* (2002) 28 Cal.4th 946, 986.)  It "need not corroborate the [accomplice] testimony in every particular" (*People v. Gurule* (2002) 28 Cal.4th 557, 628) or "'by itself establish every

---

[8]    Section 1111 defines accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  Respondent does not dispute that Linares met that definition.  The jury was instructed pursuant to CALCRIM No. 335:  "You may not convict the defendant of Counts 1, 2, 3, 4 or their lesser included offenses based on the statement or testimony of an accomplice alone.  You may use the statement or testimony of an accomplice to convict the defendant only if:  [¶] 1. the accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. that supporting evidence is independent of the accomplice's statement or testimony; and, [¶] 3. the supporting evidence tends to connect the defendant to the commission of the crime. [¶]  Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified.  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission[;] the supporting evidence must tend to connect the defendant to the commission of the crime."

element of the crime'" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 505, quoting *People v. McDermott*, *supra*, at p. 986), as long as it does more than show "'the commission of the offense or the circumstances thereof.'" (*People v. Martinez* (1982) 132 Cal.App.3d 119, 133.) Put simply, the corroborating evidence "'"is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]'" (*People v. Whalen* (2013) 56 Cal.4th 1, 55, quoting *People v. Lewis* (2001) 26 Cal.4th 334, 370; see *People v. Bunyard* (1988) 45 Cal.3d 1189, 1206-1207, disapproved in part on another ground in *People v. Diaz* (2015) Cal.4th 1176 ["'Corroborating evidence is sufficient if it substantiates enough of the accomplice's testimony to establish his credibility [citation omitted]'"].)

"'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.'" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 505, quoting *People v. McDermott*, *supra*, 28 Cal.4th at p. 986.)

When Linares was interviewed, he identified appellant as the second Hispanic man involved in the initial confrontation with the victims when they came to retrieve the weight bench, and as the man who shot at the four victims 24 hours later. Prior to being provided information about the weapon found in appellant's room, he stated that appellant used a .32 caliber handgun. Appellant's identity as the shooter was independently corroborated when investigators searched appellant's room and found a .32 caliber handgun. Appellant's involvement in the crime was further corroborated by the testimony of his brother Zelaya, who confirmed that appellant told him on May 5 that he was going to Palmdale. Appellant returned in the early morning hours of May 6, clandestinely entering the room they shared through a window. The .32 caliber handgun Linares identified as

11

the weapon was found hidden in appellant's room. Such conduct evidenced a consciousness of guilt. (See *People v. Hurd* (1970) 5 Cal.App.3d 865, 875 ["'"[E]vidence showing a consciousness of guilt, . . . may serve as a requisite corroborative circumstance . . . ."'"].) Linares's version of the crime and his credibility in general were supported by Maldonado: he related a similar description of the events that led up to the crime; he identified Linares as one of the two men who confronted him and the others when they first attempted to retrieve Williams's weight bench; he further identified Linares as the man standing next to the shooter the following day. That appellant was a long time friend of Linares's, and a fellow member of DAF also tended to support Linares's credibility, as did the evidence that DAF was an Hispanic gang, that a number of the victims were Black or perceived to be Black, and that the crime had a racial component. Considered as a whole, excluding Linares's statements, while not independently sufficient to convict appellant, provided sufficient corroboration to support the conviction.

B. *Severity of Maldonado's Injury*

The jury found that appellant inflicted GBI on Maldonado, leading to the 25-year enhancements under section 12022.53, subdivision (d). Appellant contends substantial evidence did not support the finding. We find to the contrary.

GBI is defined as "a significant or substantial physical injury." (§ 12022.7, subd. (f); see *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066 ["[GBI] is bodily injury which is significant or substantial, not insignificant, trivial or moderate."].) The standard does not require that the victim suffer "'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*People v. Escobar* (1992) 3 Cal.4th 740, 750.) Evidence of injuries resulting from a bullet tearing through the victim's leg tissue can support a finding of GBI,

although the victim suffers only short-lived pain and no permanent injury.  (See, e.g., *People v. Wolcott* (1983) 34 Cal.3d 92, 107 [bullet fragments cut into victims arms and legs; victim lost little blood, was given no sutures, was released after treatment and returned to work the next day]; *People v. Le* (2006) 137 Cal.App.4th 54, 58 [victim sustained soft tissue injury and muscular injury to both legs, fully recovered after seven weeks]; *People v. Mendias* (1993) 17 Cal.App.4th 195, 201, 205-206 [victim was shot in thigh, said the wound "'burned,'" was admitted to hospital for treatment and released the next day]; *People v. Lopez* (1986) 176 Cal.App.3d 460, 463-464 [bullets hit one victim in buttocks and another in the thigh, no evidence that wounds were more than superficial or that the victims suffered more than initial distress].)

"It is well settled that the determination of great bodily injury is essentially a question of fact, not of law. '"Whether the harm resulting to the victim . . . constitutes great bodily injury is a question of fact for the jury.  [Citation.]  If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding."'" (*People v. Escobar*, *supra*, 3 Cal.4th at p. 750.)

The bullet that struck Maldonado travelled completely through his thigh, leaving both an entry and an exit wound.  After escaping to safety, Maldonado collapsed.  He was transported to a hospital where his wound was treated and he was kept overnight.  Although he attempted to downplay his injury at trial, this was in line with his admission that he did not wish to see the shooter punished by a court of law.  The jury was provided a photograph of the injuries Maldonado suffered and could reasonably have reached the conclusion that the injury was significant in spite of his testimony.  On this record, we find the evidence sufficient to support the jury's finding.

13

C. *Verdict Forms*

Appellant contends the trial court committed reversible error by failing to provide a specific verdict form for a finding of attempted murder without premeditation. Appellant raised no objection to the verdict forms in the trial court. Generally, "[a]n objection to jury verdict forms is . . . deemed waived if not raised in the trial court." (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn. 6, overruled on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558; accord, *People v. Jones* (2003) 29 Cal.4th 1229, 1259; *People v. Bolin* (1998) 18 Cal.4th 297, 330.) Moreover, as we discuss below, clear authority from our Supreme Court precludes a finding of error for failing to supply a specific verdict form where the jury has been properly instructed.

1. *Background*

The jury was instructed that if it found appellant "guilty of attempted murder in Counts 1, 2, 3, 4," it must "then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation." It was further instructed: "The defendant acted willfully if he intended to kill when he acted. The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant premeditated if he decided to kill before acting. [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden [of] proving this allegation beyond a

14

reasonable doubt. If the People have not met this burden you must find this allegation has not been proved."

During closing argument, the prosecutor explained that "attempted murder is either regular attempted murder or it's done with premeditation, willfulness and deliberation." He then discussed the evidence that supported premeditation, willfulness and deliberation including: the confrontation over the weight bench that had occurred 24 hours earlier, the fact that the shooter fired immediately when the four men came into view, and the fact that the shooter fired multiple shots directly at the victims, one of which struck and seriously wounded Maldonado.

The jury was provided multiple verdict forms to assist its deliberations. The forms to be filled out if it determined that appellant was guilty of the four attempted murder charges stated: "We, the jury in the above-entitled action, find the Defendant, Alexander Lopez, guilty of the crime of attempted willful, deliberate, and premeditated murder who did unlawfully and with malice aforethought attempt to murder [name of victim], a human being, on or about May 6, 2012, in violation of Penal Code Section 664/187(a), a Felony, as charged in [relevant count number] of the Information." (Caps omitted.) The forms provided to indicate a determination that appellant was not guilty of the attempted murder charges stated: "We, the jury in the above-entitled action, find the Defendant, Alexander Lopez, not guilty of the crime of attempted willful, deliberate, and premeditated murder who did unlawfully and with malice aforethought attempt to murder [name of victim], a human being, on or about May 6, 2012, in violation of Penal Code /Section 664/187(a), a Felony, as charged in [relevant count number] of the Information." There is no indication in the record that the jury was provided a separate set of forms to indicate a finding of guilt of attempted murder that did not mention premeditation. Appellant contends the verdict forms forced the jury to

15

make an all or nothing choice, and that the finding of premeditation must be reversed.

### 2. *Analysis*

In *People v. Osband* (1996) 13 Cal.4th 622, 689-690, the Supreme Court addressed a nearly identical situation. The defendant had been found guilty of first degree murder. Although the jury had been properly instructed on the difference between first and second degree murder, it had not been provided a specific form to indicate a finding of second degree murder or a not guilty form for first degree murder. The defendant did not call attention to the omission at the time, but raised it on appeal. Without addressing whether the failure to notify the trial court of the omissions prevented the defendant from raising the issue on appeal, the court held: "[A]ny failure to provide a [verdict] form, if error it is, results in no prejudice when the jury has been properly instructed on the legal issue the trial presented. When 'the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if [the jurors'] conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves.'" (*Id*. at pp. 689-690, quoting *People v. Hill* (1897) 116 Cal. 562, 570.) The absence of a specific verdict form "'certainly could have no necessary tendency to preclude [the jury] from finding such verdict,'" and did not result in "'reversible error.'" (*Ibid*.)

Here, the jurors were properly instructed on the evidence required to support a finding of willful, deliberate and premeditated attempted murder. They were expressly instructed that only *if* they found appellant guilty of attempted murder could they "then decide" whether the offense "was done willfully, and with deliberation and premeditation." Nothing in the instructions permitted the jurors to conflate the concept of attempted murder with that of premeditation and

16

deliberation. Similarly, the prosecutor made it clear in closing argument that the jurors had a choice of finding appellant guilty of "regular" attempted murder, or attempted murder "done with premeditation, willfulness and deliberation," setting forth in detail the evidence supporting the latter. Thus, neither the instructions nor the prosecutor's arguments suggested that if the jurors found appellant guilty of attempted murder, they were compelled to find he had acted willfully, with deliberation and premeditation. As noted, when the jurors found a discrepancy between the language of the verdict form and the evidence at trial, they requested clarification. They exhibited no confusion regarding their obligations with regard to the attempted murder charge. Under the guidance of our Supreme Court in *People v. Osband*, to the extent any objection to the verdict form was not waived, we find any error in failing to provide an additional set of verdict forms was harmless.

### D. *Bifurcation of Gang Allegation*

After jury selection had begun but prior to the start of trial, defense counsel moved to bifurcate issues pertaining to the gang allegation from the trial on the substantive counts. The court denied the request noting that the prospective jurors already had been told about the gang enhancement and stating it was important to voir dire the jury on the gang issue. Appellant contends that the court abused its discretion by failing to analyze whether the gang evidence was more prejudicial than probative to the substantive crimes under Evidence Code section 352, and that the gang evidence admitted should have been excluded under section 352.

A trial court has discretion to bifurcate the trial of the gang enhancement. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) In *People v. Hernandez*, the Supreme Court observed that gang enhancement allegations are different from, for example, prior conviction allegations -- which are typically bifurcated -- in that the

17

latter "relates to the defendant's status and may have no connection to the charged offense," whereas "the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*Id*. at p. 1048, italics deleted.) "Evidence of the defendant's gang affiliation -- including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like -- can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Id*. at p. 1049.) Accordingly, "less need for bifurcation generally exists with the gang enhancement . . . ." (*Id*. at p. 1048.) "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself -- for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged -- a court may still deny bifurcation." (*Id*. at p. 1050.)

Appellant's contention that the gang evidence had "minimal probative value" is based primarily on the arguments the prosecutor raised in opposition to the pretrial motion to bifurcate, and specifically, his failure to "argue that [appellant's] association with a gang was relevant to prove any material fact related to the assaults themselves, such as motive or identity." In determining whether the trial court abused its discretion, we are not limited to arguments raised by the prosecutor below. As set forth in respondent's brief, appellant's and Linares's membership in DAF was relevant to motive: to explain how a squabble over possession of a weight bench could lead to four counts of attempted murder. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168 ["Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related."].) Linares told the detectives that during the original confrontation, when he and appellant refused to let the men take the bench,

18

appellant "let [the men] know who he [wa]s," referring to appellant's gang nickname. Detective Delia explained the importance of respect in gang culture and the prospect of violent retaliation when a member feels that he has been disrespected or "mad dogged." There was additional relevance to the gang evidence. The perpetrators' gang membership provided an explanation for Maldonado's failure to identify appellant, his denial that he had previously identified Linares, his minimization of his injuries, and the discrepancies between Linares's statements to the detectives and his testimony in court. It also explained the inability of the prosecution to produce the other three victims in court to testify. In view of the relevance of gang evidence to issues at trial, the court did not abuse its discretion in refusing to bifurcate.

Appellant attempts to convince us that the evidence was unduly provocative under Evidence Code section 352. We have reviewed Detective Delia's testimony and found to the contrary. His testimony was brief and to the point, without any unnecessary embellishment or detail. The portion of his testimony describing DAF, their activities and the two predicate offenses supporting their denomination as a criminal street gang comprised only four or five pages of testimony. Detective Delia's testimony was a far cry from that of the gang expert in *People v. Albarran* (2007) 149 Cal.App.4th 214, cited by appellant, who "testified at length about the identities of other 13 Kings members, the wide variety of crimes they had committed and the numerous contacts between the various gang members (other than [the defendant]) and the police." (*Id*. at pp. 227-228, fn. omitted.) Moreover, the evidence was not presented merely to show appellant's criminal disposition and character, as in *People v. Memory* (2010) 182 Cal.App.4th 835, 859, also cited by appellant. On this record, there was no abuse of discretion in the court's denial of the motion to bifurcate and no undue prejudice from the admission of the gang evidence.

19

E. *Predicate Acts*

To support a gang enhancement, and specifically, to support that the gang meets the definition of a "'criminal street gang'" under the applicable statute, the prosecution must provide evidence of two predicate acts. (See § 186.22, subds. (e) & (f); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457 [to support section 186.22 enhancement, prosecution must prove the gang's members engaged in "'a pattern of criminal gang activity'" consisting of "'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period"].) Through Detective Delia, the prosecution presented evidence of the two necessary predicate acts -- murders and assault committed by Oscar Flores and Jorge Linares in 2008 and 2009. Appellant contends the prosecutor should have been required to present evidence of less provocative or inflammatory crimes.

As respondent points out, appellant forfeited this contention by failing to raise any objection below. (See *People v. Hinton* (2006) 37 Cal.4th 839, 893, fn. 19.) Moreover, we see no basis for the trial court to have excluded the evidence had objection been raised. Appellant cites no authority for the proposition that in deciding which crimes to introduce to the jury for the purpose of establishing the necessary predicate acts, the prosecution must select the least serious, and we are aware of none. Nor does he present anything to suggest that the prosecution had at its disposal documentary evidence of other predicate acts committed by members of DAF within the requisite time frame. More importantly, as discussed, the evidence was presented with no unnecessary detail or embellishment that might have inflamed the jurors' emotions or prejudices. Accordingly, even had an Evidence Code section 352 objection been raised, exclusion of the evidence of the two predicate acts would not have been warranted.

20

F. *Introduction of Handgun Found in Appellant's Room*

Prior to trial, the defense objected under Evidence Code section 352 to introduction of the handgun found in the search of appellant's room. The court overruled the objection, pointing out that Linares had identified the gun as the weapon used in the shootings. Appellant contends the court should have excluded the gun from evidence because there was "not substantial evidence tying that particular gun to the shootings" and "the mere fact that appellant illegally possessed a firearm" was unduly prejudicial.

Appellant's contentions are contrary to the evidence presented. Linares identified appellant as the shooter and stated that he used a .32 caliber handgun. A .32 caliber handgun was found hidden in appellant's room. When shown a photograph of the gun found in appellant's room, Linares identified as the weapon used. Thus, the gun was an important item of evidence tying appellant to the crime. The trial court did not abuse its discretion in admitting it.

G. *Competency of Counsel*

At trial, Maldonado testified that shortly before the shooting, Williams had told the other three victims that the "guys over there" had said they could go get the weight bench. Defense counsel did not object or seek a limiting instruction. During closing argument, the prosecutor referred to this evidence, along with a number of other factors, in support of the argument that the attempted murders were premeditated.[9] Appellant contends that the failure to object or seek an

---

[9] The following other evidence was also raised by the prosecutor to support premeditation: (1) the shooter was armed and waiting; (2) as soon as the victims turned the corner to the location of the bench, multiple shots were fired; (3) the shots were aimed directly at the victims, as evidenced by the fact that one hit Maldonado; and (4) there had been an earlier confrontation between the victims and perpetrators over the bench.

instruction limiting the evidence to proving Maldonado's state of mind and his actions that night established the ineffectiveness of trial counsel.[10]

In order to establish ineffective assistance of counsel sufficient to overturn a conviction, the defendant must show: "(1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability of an adverse effect on the outcome. [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. omitted, overruled in part on another ground in *People v. Hill* (1998) 17 Cal.4th 800.) "'Failure to object rarely constitutes constitutionally ineffective legal representation.'" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 493, fn. 3, quoting *People v. Boyette* (2002) 29 Cal.4th 381, 424.) "'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]'" (*People v. Abilez*, *supra*, at p. 493, fn. 3, quoting *People v. Gray* (2005) 37 Cal.4th 168, 207.)

Presuming trial counsel's failure to object or request a limiting instruction had no strategic purpose, we find no prejudice. The evidence concerning the identity of appellant as the shooter was hotly disputed, but there was no dispute concerning the events leading up to the shooting. Williams, accompanied by one or two companions, tried to pick up his weight bench from his former residence. More than one of the men were perceived to be Black. They had a heated encounter with two Hispanic men -- Linares and appellant -- who referred to their

---

[10] Appellant also contends that counsel's failure to object to the introduction of the evidence concerning the two predicate acts represented ineffective assistance. For the reasons discussed, we find no basis for excluding that evidence and conclude that objecting would have been a futile act.

race in a derogatory manner. Twenty-four hours later, Williams returned, accompanied by three men. They were confronted by the same two Hispanic men, one of whom -- appellant -- was armed and ready to shoot the moment they appeared. Multiple shots were fired in their direction. Maldonado was hit and seriously wounded. On this record, there was no reasonable probability of a different outcome had trial counsel objected or requested a limiting instruction. (*People v. Berryman, supra,* 6 Cal.4th at p. 1081.)

### H. *Sentencing Errors*

Immediately prior to sentencing, the trial court indicated on the record that it had no discretion to impose concurrent sentences for the four counts of attempted murder, but was obliged to impose consecutive sentences. It is settled, however, that where, as here, a defendant is sentenced on multiple felony counts under the "Three Strikes" Law, the trial court may impose concurrent sentences when the current offenses were committed on the same occasion or arise from the same set of operative facts even though they involve different victims. (See *People v. Deloza* (1998) 18 Cal.4th 585, 590-596; *People v. Hendrix* (1997) 16 Cal.4th 508, 511-515.) The Attorney General acknowledges that on the record below, the trial court had discretion to impose concurrent sentences, but failed to exercise that discretion. Accordingly, the sentence must be vacated and the matter remanded for the trial court to exercise its discretion in sentencing appellant.[11]

---

[11]    Respondent points out other errors in the abstract of judgment, including typographical errors regarding the section 667, subdivision (a)(1) enhancements, and the failure of the abstract to conform to the court's oral pronouncement regarding the lesser related offenses. These errors too should be corrected on remand.

23

## DISPOSITION

The sentence is vacated and the matter is remanded for resentencing.  In all other respects, the judgment is affirmed.  Following resentencing, an amended abstract of judgment shall be prepared and delivered to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.